[No. B036751. Second Dist., Div. Four. Apr. 20, 1989.]

THE PEOPLE ex rel. ROXANI M. GILLESPIE, as Insurance Commissioner, etc., Plaintiff and Respondent, v. NICHOLAS NEU et al., Defendants and Appellants.

COUNSEL

Miller, Daar & Newman and David Daar for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Richard W. Bakke, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GOERTZEN, J.—Plaintiff/respondent the People of the State of California, acting by and through the Insurance Commissioner (Commissioner) petitioned the superior court for a preliminary injunction, preventing defendants/appellants Nicholas Neu and Michael Gershuny from violating Insurance Code sections 700 (transacting insurance business without a certificate of authority) and 703 (acting for a nonadmitted insurer.)[1] The superior court granted the preliminary injunction; and appellants Neu and Gershuny appeal, asserting that the court abused its discretion because there was no evidence of a present or threatened violation of the pertinent Insurance Code sections; and the preliminary injunction prohibits appellants from engaging in a lawful business, not regulated by the Commissioner.

## FACTS

Automobile Maintenance Contracts, Inc. (AMC) is a Delaware corporation with its principal place of business in the City of Inglewood. Appellant Neu was a vice-president of AMC, at least until about March 1987; appellant Gershuny also was a vice-president and operational manager of AMC.

On or about March 1, 1986, AMC began selling auto repair contracts. As of March 1987, AMC had sold approximately 8,000 of such contracts in California. The documents which comprised this contract included an application, a prepaid automobile service agreement and membership enrollment plan, membership enrollment guidelines, a rating work sheet, a brochure entitled "If You Have An Accident And If Towing Is Required," a form for inventory of a car's condition and equipment, and an undated letter addressed "Dear Broker."

The application requested operator and vehicle information. It included, among other things, a requirement for burglar alarms on specified vehicles;

---

[1] The other defendants, Automobile Maintenance Contracts, Inc., a Delaware corporation; John Senise; Michael York; and David Brown are not parties to this appeal.

a request that the applicant list accidents or violations during the previous three-year period, and the names, dates of birth, marital status, years driving and driver's licenses of all licensed drivers of the vehicle; a provision voiding the contract upon suspension or revocation of driver's license or vehicle registration; and a list of the service charge choices, ranging from $250 to $1,000, and payment terms.

The AMC Agreement (Agreement) provided that the purchaser pay a membership fee/prepayment to AMC. Graduated payment plans were offered, and the amount of the membership fee was determined, in part, by whether the driver was under or over the age of 25. AMC agreed to repair the purchaser's car at facilities it owned or with which it had contracted. Such repair was limited to body damage, and mechanical and electrical parts. Damage must have resulted from collision, fire, vandalism, malicious mischief or theft. If repair costs exceeded the service charge (a deductible) and prepayment, AMC paid the additional costs using "Membership and prepayment fees, accrued in any three year period" and subrogation. If these two sources were inadequate, the payment of the additional cost was made to AMC by the insurance company "who insure[d] that risk." The Agreement further provided that "All total loss coverage from collision, fire or theft, is provided for by the insurance company who insures AMC for that contingency." The Agreement was cancelable, with refunds on pro rata and short rate basis.

AMC sold these contracts through regular insurance agents, who were signed up by AMC marketing representatives. Before enrolling a member, the insurance agent was required to complete a premembership photo inspection form which described in detail the present state of the vehicle.

AMC claimed its exclusive fire, theft, and collision protection was "the best insurance alternative" and promised, among other things, that total losses were fully insured and all service contracts were insured for performance by an international insurance company.[2]

The contractual liability policy used by AMC in its operation is a comprehensive/physical/damage and/or a stop loss contractual liability policy

---

[2] In its membership enrollment guidelines brochure, AMC advertised "1. Same day repair service when possible. [¶] 2. No waiting for an adjuster. [¶] 3. No estimate of repairs is necessary. [¶] 4. No waiting for check to commence repairs. [¶] 5. Loss of use collection service for commercial vehicles. [¶] 6. Free pick-up service. [¶] 7. All service contracts are insured for performance by an international insurance company. [¶] 8. Total losses fully insured. [¶] 9. Minimal loss of use of your automobile. [¶] 10. Free 24 hour towing to our repair facility." It also promised that "1. Each contract is insured via a Contractual Liability Insurance Policy! [¶] 2. All claims will be handled professionally and expediently by our qualified service writers. [¶] 3. AMC is authorized to settle claims. [¶] 4. AMC pays 18% commission on new business and 20% on renewals, (Private Passenger Vehicles Only). [¶] 5. Immediate Members binding via the telephone—Monday through Saturday."

which names AMC "and its members." Between May 1, 1986, and December 31, 1986, AMC contracted with Lloyd's U.S. of Dallas, Texas, nonadmitted as an insurer in the State of California; from November 1, 1986, onwards, AMC contracted with First National Life & Casualty Assurance Company Ltd. of Barbados, West Indies, nonadmitted as an insurer in the State of California.

AMC is not in the business of selling or leasing automobiles, and its contracts are not incidental to a business of selling or leasing automobiles. AMC has received no certificate of authority from the Commissioner to transact automobile insurance business in California. AMC provided lending institutions with membership certificates as evidence of insurance for a borrower/member.[3]

The Albert E. Jaeger Insurance Agency of Hayward, California, sent an AMC contract and schedule of rates to the Department of Insurance. In response to the Jaeger Agency inquiry, on December 31, 1986, the department's senior counsel, John M. Fogg, opined that the AMC contracts were service contracts. However, by sworn declaration, Mr. Fogg later explained that after offering this opinion, he learned that AMC was giving loss payee endorsements to lenders, the AMC contracts were being used as if they were insurance contracts, and AMC was not itself repairing cars but having body shops perform this work. He concluded that, "Giving . . . loss payee endorsements to lenders has nothing to do with a service function and everything to do with an insurance function."

Richard J. Roth, Jr., the Assistant Commissioner and Chief Property/Casualty Actuary for the California Department of Insurance, also submitted a sworn declaration. He related that he had met with the manager of AMC in June 1987. After listing the characteristics of the AMC contract, he opined that it was a form of insurance.[4]

After leaving the AMC Southern California operation, appellants moved to northern California and maintained an office in Hayward. The following automobile repair service companies operated out of this same Hayward office: (1) American Fire, Theft & Collision Managers, Inc., a California corporation, listing appellant Neu as the chief executive officer, secretary,

---

[3] Several loan officers submitted sworn declarations describing AMC's use of certificates of insurance in December 1986, January 1987, and March 1987.

[4] Mr. Roth's qualifications to offer this opinion are as follows: he is a fully certified casualty actuary, a Fellow of the Casualty Actuarial Society and has passed 10 national examinations. He received his B.S., M.S. and M.A. degrees from Stanford University and a J.D. degree from the University of Connecticut School of Law. He began work for the Department of Insurance in 1981 and was promoted to his current position in 1984.

chief financial officer and only director. (2) American Maintenance Contracts, Inc. (AMC-2), a California corporation (distinct from AMC in southern California which is a Delaware corporation). Appellant Neu is a director of AMC-2. (3) National Auto Plan (National). Jeffrey Jacobs is specified as the incorporator of American Fire, AMC-2, and National. Appellant Gershuny admits to being an officer, shareholder and director of National. A George Neu is listed on National's statement of domestic stock corporation, and the listed purpose is "automobile service contracts." (4) American Pacific Autoplan (APA) is a "doing business as" of American Fire.

The contracts offered in northern California by AMC-2 and by APA were the same, or virtually the same, as those offered by AMC in southern California. The application forms, mandatory photo inspections forms, the membership certificate, the certificate of insurance, and the lienholder's certificate of insurance were all identical. The membership certificate includes the following statement: "Claims will be paid according to actual policy provisions. The policy is on file with the policy holder-insured, and may be viewed during regular business hours. [¶] Automobile Maintenance Contracts, Inc. certifies that it has purchased an Insurance Policy from an International Insurance Company. The following is a summary of coverages: A. Contractual Liability Insurance. B. Total Loss Insurance. C. Excess Cost of Repairs Insurance. D. Fire & Theft Insurance."

As was AMC's practice in southern California, AMC-2 and APA in northern California recruited insurance agents to sell their plan and sent certificates of insurance to various lienholders as proof of coverage for a member/borrower.

## PROCEDURAL HISTORY

The Commissioner filed the complaint for injunction on March 22, 1988. Pursuant to Insurance Code section 12928.6,[5] the Commissioner sought to enjoin appellants from violating section 700 (transacting insurance business without first being admitted and obtaining a certificate of authority from the Commissioner) and section 703 (acting as an agent for a nonadmitted insurer, advertising a nonadmitted insurer, and aiding a nonadmitted insurer to transact insurance business in this state).

Seeking immediate relief, the Commissioner filed a motion for a preliminary injunction on April 8, 1988. AMC and defendant Brown stipulated to the preliminary injunction. As against appellants Neu and Gershuny, the hearing on this motion was held on May 18, 1988. In opposition, appellants

---

[5] All statutory references are to the Insurance Code unless otherwise indicated.

argued that the violating contracts were used by AMC after they each had departed the company, and the expert opinion determining that the AMC contracts were insurance was based upon analysis of these newer contracts. Pointing to Mr. Fogg's first opinion that the AMC contracts, sold while they were with AMC, were not insurance, they asserted that the allegation that they each would "continue to violate provisions of the Insurance Code" was without evidentiary support.

The trial court granted the motion for the preliminary injunction. In pertinent part, it enjoined appellants Neu and Gershuny "(a) From doing any act in violation of Insurance Code section 700(a), by transacting the business of insurance in the State of California, including but not limited to soliciting, offering for sale, selling, entering into, and/or renewing, any contract to engage in the business of repairing, or compensating consumers for, motor vehicles damaged or lost as a result of accidents, collisions, fires, thefts, natural disasters, and/or vandalism for a fee, the amount of which is agreed upon at the time of the sale of the contract, directly or through insurance brokers and agents; and [¶] (b) From doing any act in violation of Insurance Code section 703, including but not limited to (1) employing in the conduct of insurance business contractual liability policies of non-admitted insurers which empower such business to issue individual certificates of comprehensive/physical damage insurance and (2) providing individual certificates of comprehensive/physical damage insurance of any non-admitted insurer to lienholders on automobiles."

## DISCUSSION

■ *Issuance of the Preliminary Injunction.* Appellants contend that there is no evidence of a present or threatened violation of the Insurance Code upon which to base entry of an injunction.

■ "The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court. [Citations.]" (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) The trial court "should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]" (*Id.,* at. pp. 69-70.)

■ On review, we examine the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in his or her favor

and resolving conflicts in the evidence in favor of the trial court's order. (*Christopher* v. *Jones* (1964) 231 Cal.App.2d 408, 412 [41 Cal.Rptr. 828].)

Appellants have not focused their argument on a lack of evidence to support the court's determination that the two factors identified above weigh in favor of the issuance of a preliminary injunction; rather, they ground their contention of error on the language of section 12928.6.[6] Asserting that the Commissioner is authorized to commence an action and seek an injunction only where it is believed that a person, "is violating or about to violate" the Insurance Code, appellants contend there is no evidence to support such a belief. We disagree.

The evidence presented by the Commissioner, summarized above and viewed in the light most favorable to the court's order, supports a finding that appellants' actions constituted a threat of continuing public harm. Without repeating all the evidence, we note that upon leaving AMC, appellants moved the operation they had devised in southern California, almost intact, to northern California. The modus operandi of AMC-2 and APA was strikingly similar, if not identical, to that of AMC.

Appellants object and point to Mr. Fogg's opinion that the AMC contract was not insurance. However, the court had before it Mr. Fogg's declaration, explaining the circumstances under which that first opinion was rendered to the Jaeger Agency. Only after writing the letter did Mr. Fogg become aware that AMC was giving loss payee endorsements to lenders, that AMC contracts were being used as insurance contracts, and that AMC was not itself repairing cars but having body shops perform the work. Mr. Fogg concluded that had all this information been available to him when he wrote to the Jaeger Agency, he would have opined that the AMC contract as it was being used constituted the transaction of insurance business.

Appellants also argue that the declaration of Richard Roth, Assistant Commissioner of the Department of Insurance, analyzes only the AMC contract used after their departure from AMC. Our reading of the Roth declaration shows that Roth is analyzing all of the AMC contracts, including those used by appellants at AMC. The Roth declaration can also be

---

[6] In pertinent part, section 12928.6 provides: "Whenever the commissioner believes, from evidence satisfactory to him, that any person is violating or about to violate any provisions of this code or any order or requirement of the commissioner issued or promulgated pursuant to authority expressly granted the commissioner by any provision of this code or by law, the commissioner may bring an action in the name of the people of the State of California in the superior court . . . against such person to enjoin such person from continuing such violation or engaging therein or doing any act in furtherance thereof. In such action an order or judgment may be entered awarding such preliminary or final injunction as is proper."

used to analyze the contracts used by appellants after they departed AMC and moved their business to northern California.

Clearly, there is evidence to support the court's conclusion that there was a present or threatened violation of the Insurance Code sufficient to sustain entry of an injunction.

■ *The Wording of the Preliminary Injunction.* Appellants contend that the trial court abused its discretion by issuing the preliminary injunction in a form which would prevent them from engaging in a lawful occupation—contracting to repair automobiles which have been damaged by collision. In fact, the preliminary injunction, quoted above, does not disallow appellants from engaging in the repair of automobiles, *unless* it is through the format of conducting insurance business without a certificate to do so from the Commissioner. The preliminary injunction is against the conduct of such insurance business, and it is framed with sufficient specificity to allow appellants to understand what the court prohibited.

### DISPOSITION

The order granting a preliminary injunction is affirmed.

McClosky, Acting P. J., and George, J., concurred.