[No. B053611. Second Dist., Div. Three. Aug. 2, 1991.]

EMMA CASTRO et al., Plaintiffs and Appellants, v.
LOS ANGELES COUNTY BOARD OF SUPERVISORS et al., Defendants
and Respondents.

**COUNSEL**

Litt & Stormer, Dan Stormer and Virginia Keeny for Plaintiffs and Appellants.

Nossaman, Guthner, Knox & Elliott, Alvin S. Kaufer and John Ossiff for Defendants and Respondents.

**OPINION**

**HINZ, J.**—

## INTRODUCTION

Plaintiffs sought a preliminary injunction against a public, nonprofit corporation created to provide legal services in dependency court. Plaintiffs claimed that representation of multiple parties with potentially adverse interests created a conflict of interest within the corporation and among its attorneys. Finding, as did the trial court, no merit to these claims, we affirm the denial of plaintiffs' motion for a preliminary injunction.

On April 25, 1990, plaintiffs Emma Castro and Elaine Rosen (individually and as taxpayers), and the Juvenile Courts Bar Association, on behalf of itself and its membership, filed a petition for writ of mandate and complaint for declaratory and injunctive relief against the Los Angeles County Board of Supervisors (the Board) and its five members, De Witt Clinton (L.A. County Counsel), Richard Dixon (L.A. County Chief Administrative Officer), Dependency Court Legal Services, Inc. (DCLS), and Alan Oberstein (director of DCLS).

The petition and complaint challenged the Board's formation and funding of DCLS, a corporation, and alleged five causes of action: demand for due process (42 U.S.C. § 1983); demand for due process (Cal. Const., art. I, § 7); declaratory and injunctive relief (Code Civ. Proc., § 526, subd. (l)); writ of mandamus (Code Civ. Proc., §§ 128, 1085; Welf. & Inst. Code, § 317); and demand for compliance with public bidding of contract. On April 25, 1990, the trial court granted plaintiffs' ex parte application for an order to show cause why a preliminary injunction and writ of mandamus should not issue.

On May 22, 1990, however, the trial court denied a preliminary injunction, making five findings. First, Welfare and Institutions Code section 317 requires the Board to provide counsel to each indigent party affected by a dependency proceeding. Second, the Board may legally contract with a corporation to provide such services, and the contract between the Board and DCLS is not illegal. Third, plaintiffs are not within the class of persons protected by Welfare and Institutions Code section 317, which finding,

fourth, precludes relief on their first, second, fourth, or fifth causes of action, and precludes injunctive relief. Fifth, plaintiffs have not proven that performance of the agreement between the Board and DCLS will cause representation of conflicting interests by any attorney or any other violation of the State Bar Rules of Professional Conduct. The State Bar Act provides remedies if violations occur. The agreement between the Board and DCLS does not require any violations, and does not, for instance, prohibit DCLS from entering into subcontracts with separate corporations or firms for representation of conflicting interests. Nor does it prohibit DCLS from requiring those entities to maintain the physical separation, name distinction, and other attributes necessary to avoid any appearance of impropriety.

On June 1, 1990, plaintiffs' first amended complaint added a sixth cause of action for violation of Business and Professions Code section 17200. DCLS cross-complained for declaratory relief on July 13, 1990.

On August 16, 1990, the trial court again denied plaintiffs' request for a preliminary injunction. It found that because facts supporting plaintiffs' motion were entirely hypothetical, the case did not present an actual controversy within Code of Civil Procedure section 1060. Furthermore, the alleged instances of representation of conflicting interests were neither significant nor likely to recur, and therefore did not support the injunctive relief requested.

On October 3, 1990, plaintiffs filed a notice of appeal from the August 16, 1990 denial of a preliminary injunction.

### STANDARD OF REVIEW

Whether a preliminary injunction shall be granted rests largely in the trial court's discretion. The appellate court will not reverse the trial court's ruling unless a manifest abuse of discretion has occurred. (*Jones* v. *California Interscholastic Federation* (1988) 197 Cal.App.3d 751, 756 [243 Cal.Rptr. 271].) The trial court should evaluate two related factors: first, the likelihood that plaintiff will prevail on the merits at trial, and second, the interim harm the plaintiff will likely sustain if the injunction were denied compared to the harm the defendant will likely suffer if the preliminary injunction were issued. (*People* ex rel. *Gillespie* v. *Neu* (1989) 209 Cal.App.3d 1066, 1072 [257 Cal.Rptr. 778].)

### FACTS

The facts submitted before the trial court by plaintiffs in their first amended complaint and in later papers are as follows. Welfare and

Institutions Code section 317 requires that in dependency court proceedings, the superior court must appoint counsel for one or both parents if they cannot afford private counsel, and for the minor child if the child's position differs from that taken by the department of children's services. The superior court traditionally appointed such counsel from a panel of independent attorneys.

To save money, in 1989 the county formed DCLS to represent all parties at dependency proceedings, and replaced the panel system. Under the agreement, the DCLS corporation must represent as many as three separate parties in a dependency proceeding, even if they have conflicting interests. Under its operating rules, DCLS has three divisions, each with a section head acting as attorney of record for that division and reporting to an assistant director who in turn reports to the executive director.

DCLS began hiring attorneys and accepting cases April 23, 1990. The executive director approves hiring of attorneys. Because the rules give corporate officers and directors the ability to review the performance of staff attorneys, the executive director and deputy director will help train and will control day-to-day decisions of staff attorneys and section heads.

The first amended complaint alleged several ethical problems. First, the dependency court does not have jurisdiction unless there is a dependent or neglected child, and brings adults into the proceedings only if the dependency court can claim jurisdiction because of the adult's relationship with the child. The DCLS—a single law firm—would represent children and adults in the same action.

Second, this could result in one section of the same law firm representing the child, another section representing one parent, and a third section representing a second parent.

Third, the sections share office space, administration, funding, law library, computer litigation system, form and brief banks, and personnel policies.

Fourth, the executive director has ultimate authority for hiring and firing attorneys, and for approving or disapproving performance evaluations.

Fifth, although the attorney of record in each case will be the division or team leader, that person reports to and is under the authority of the executive director.

Sixth, persons have been hired who have information about ongoing or reopened cases, some of which will be brought into the office.

Seventh, opposing attorneys and their support staff will have access to confidential case files even for those persons who may have their cases reopened.

Plaintiffs' June 23, 1990, supplementary documentation re: preliminary injunction alleged that defendants were accepting appointments of multiple parties in the same proceeding whether or not a conflict exists between those parties. The executive director was responsible for hiring and firing, work hours, procedures for resolving conflict of interest problems, reviewing individual attorneys, decisions establishing administrative policies and for pay scales, decisions concerning hiring heads of individual groups and how much money will be allotted to individual groups, and for training standards. Group heads share information about the groups' needs, attorney evaluations, and problems, and cooperate in hiring and maintaining quality within the groups. Group heads participate in hiring staff for other groups, and may discuss case strategies and policies with the executive director.

The facts submitted by defendants to the trial court in response to the first amended complaint and in opposition to plaintiffs' request for a preliminary injunction are as follows. DCLS, a nonprofit, public benefit corporation, contracted with Los Angeles County in January 1990 to provide legal representation in dependency court proceedings when the court determines that the parties require independent representation but cannot afford counsel.

DCLS has an administrative unit and three separate groups which it describes as "three separate law firms, except that they all receive funding through the administrative unit and the administrative unit handles certain common administrative functions, unrelated to providing legal representation." The contract requires DCLS to ensure that the three groups are of comparable quality.

Plaintiffs Castro and Rosen are members of a panel of attorneys who, pursuant to court appointment, have hitherto represented parties in dependency court. Plaintiff Juvenile Courts Bar Association is an association of attorneys who have represented parties in dependency court proceedings. If DCLS provides contracted legal services, they will be in lieu of services plaintiffs would have otherwise provided.

DCLS contended that if its separate groups each represented an adverse party in the same case, no conflict of interest would occur so long as: DCLS is a nonprofit corporation; each law group had a supervisor who is attorney of record; all decisions regarding the handling of cases by a law group were

made only by attorneys within the law group; staff attorneys report only to the head of their respective law group; no one outside a law group had access to confidential information regarding any case handled by that law group; only the head of a law group could recommend firing and salary adjustments in terms of the staff attorneys' employment; each law group was physically separate from the others and had independent files, computers, office space, and clerical help; and the administrative unit had no role in handling individual cases and no access to confidential information.

A declaration submitted by the head of one of DCLS's three separate groups, Randall Pacheco, stated that after Alan Oberstein, DCLS director, hired him, Oberstein informed Pacheco that all decisions, policies, suggestions or directives regarding representation of clients and handling of cases by Pacheco's office were entirely within Pacheco's discretion. Case files and information about the facts and merits of a case remained confidential to Pacheco's office. His offices would occupy separate suites, sharing only a supply room and photocopier with the other two DCLS groups. A separate staff and attorneys would work only for Pacheco's group. Individual salary raises and discipline or termination of any employee within his group would be only on Pacheco's recommendation. Neither DCLS nor the other two groups could influence Pacheco's discretion or that of attorneys in his group as to representation of clients or conduct of the group.

Pacheco kept files separate and secure from the other two groups and from the DCLS administrative unit. Pacheco informed attorneys in his group of the policy that each attorney is to make all decisions regarding a case based only on the client's best interest. Attorneys were informed that attorneys from the other two DCLS groups were to receive no more or less consideration than any other attorney representing another party to an action.

Jo Kaplan and Robert L. Stevenson, employed by DCLS as heads of law groups, declared that no attorneys in their law groups worked out of the same suite or used the same telephone number, address, or receptionist as other DCLS law groups. Stevenson instructed each attorney in his group never to stand in for another attorney unless that attorney was within the Stevenson group.

DCLS also submitted a copy of its "Conflict of Interest Policy and Procedures." It defined conflicts of interest, set forth a procedure to determine conflict of interests and a procedure to use in court if an attorney learned of a conflict of interest, and indicated how to report and record a conflict of interest.

If conflicts necessitate more than three separate counsel, the dependency court will use the Welfare and Institutions Code section 317 panel to appoint outside counsel for remaining parties that DCLS attorneys cannot represent.

### ISSUES

Plaintiffs claim on appeal that:

1. Due process and Welfare and Constitutions Code section 317 prohibit conflicts of interest between court appointed counsel in dependency proceedings and the children and other parties they have been appointed to represent;

2. Because DCLS must be treated as a single firm for purposes of determining conflicts of interest, DCLS may not represent adverse parties in a single proceeding;

3. DCLS's representation of opposing parties in a single proceeding will create the appearance of impropriety;

4. A former Auxiliary Legal Services (ALS) attorney, Robert Stevenson, cannot serve as a DCLS staff director because many conflicts will result; and that

5. Plaintiffs are entitled to a preliminary injunction.

### DISCUSSION

Plaintiffs make numerous arguments concerning the statutory and due process right to a court-appointed attorney of children, their parents, and guardians subject to dependency proceedings, and to the effective assistance of counsel. Plaintiffs cite *In re Patricia E.* (1985) 174 Cal.App.3d 1, 9 [219 Cal.Rptr. 783], concerning how a conflict of interest between an attorney and a client deprives the client of the effective assistance of counsel. *Patricia E.*, however, concerned a situation in which the same deputy county counsel represented both the county and a minor in a dependency proceeding. The opinion indicated that in some circumstances such dual representation may be permissible. (*Id.*, at p. 8.) *Patricia E.* reversed the juvenile court's order continuing the minor as a dependent child of the court because the trial court failed to assess the need for the appointment of independent counsel for the minor.

The case at bench does not raise that issue. Instead, plaintiffs contend that if two or more DCLS attorneys represent different parties in a dependency court proceeding, the attorneys' employment for DCLS creates a conflict of

interest. Plaintiffs argue that the three groups do not function autonomously enough to prevent attorneys from experiencing conflicts with their clients. Plaintiffs contend that the DCLS groups cooperate in hiring and staffing, and have a single executive director responsible for hiring, firing, salaries, and performance evaluations, for setting policy, and for allocating funding between the three groups.

Plaintiffs cite a "vicarious" or firm disqualification doctrine adopted in *Klein* v. *Superior Court* (1988) 198 Cal.App.3d 894, 911-913 [244 Cal.Rptr. 226], and *William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1048-1049 [197 Cal.Rptr. 232]. In *Klein*, the trial court granted a defense motion to disqualify plaintiffs' law firm (Fenwick) because one of its partners (Glickman) had formerly been a member of another firm (Fuller) which had provided legal services to the defendant. *Klein* held that where Glickman received confidential information at the Fuller firm and where no effort was made, before Glickman was disqualified, to screen him from other members of the Fenwick firm, the entire Fenwick firm had to be disqualified. (*Id.*, at pp. 913-914.)

*Klein* stated: ". . . California decisions remain concerned with the possibility of the breach of confidence which alone triggers disqualification when a sufficiently close relationship has been demonstrated between present and former representation. [Citations.]" (*Id.*, at p. 913.) The case at bench, however, does not involve successive representation of opposing parties by the same attorney. ■ DCLS's evidence concerning screening measures and "Chinese walls" was credited by the trial court, to whose resolution of conflicting evidence we must necessarily defer. (*Id.*, at pp. 908, 913.)

In *Raley*, a bank owned the Raley company as trustee. ZoBell, a bank director, sat on its trust investment committee. ZoBell, an attorney, was senior partner in a law firm whose San Diego office represented the bank in various corporate matters, but not in its trust matters. Before ZoBell's law firm's El Centro office became plaintiff Carey's counsel in his suit against the Raley company, the law firm completed its normal conflict of interest check procedures. Attorneys from the firm's El Centro and San Diego offices perceived no conflict, but did not know about ZoBell's positions with the bank and committee. Blume represented the bank as trustee of the trust and also represented Raley in Carroll's lawsuit. When Blume told the bank he believed a conflict existed because of ZoBell's positions, ZoBell took steps to screen himself from any matters involving Raley and the trust at both the bank and at his law firm. (*Raley, supra,* 149 Cal.App.3d at pp. 1044-1046.)

*Raley* based ZoBell's disqualification on California State Bar Rules of Professional Conduct, former rule 5-102(B), and required the "vicarious

disqualification" of his firm. Although ZoBell had removed himself from Raley and trust matters at the bank and the committee, he had not sent his letter of immunization to every bank director and committee member. ZoBell also could not assure that in casual conversations with bank directors or committee members, he would not obtain confidential information about Raley or its defense in the lawsuit. Similar factors applied in ZoBell's relations with his law firm, and his "ongoing dual status create[d] a risk of misappropriation of confidential information about Raley pertinent to Carroll's lawsuit." (149 Cal.App.3d at p. 1049.)

*Raley*, however, emphasized that rulings on disqualifications must proceed according to the circumstances of each case, in light of several competing interests. "The court must weigh the combined effect of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest. [Citations.] In a case such as this the court also must consider in favor of disqualification the disruptive effect of repeated disqualification proceedings on the administrative process of the court [citation] and the financial burden of such proceedings on the moving party. Absent an abuse of discretion, a trial court's decision in a disqualification proceeding will not be disturbed on appeal. [Citation.]" (149 Cal.App.3d at p. 1048.)

The dangers present in *Klein* or *Raley* do not appear to arise from DCLS's representation of its clients. ■ First, plaintiffs analogize DCLS to a private law firm, which, they argue, would be prohibited from representing adverse interests "because of the obvious financial incentive to favor the more important client's interests over those of a lesser client." This imperfect analogy, however, exposes plaintiffs' flawed premise. In a private law firm, clients pay for legal services the firm renders on their behalf. DCLS, by contrast, represents clients who cannot and do not pay for services rendered on their behalf. A third party, the board, funds DCLS, and clients do not pay for the services the law firm renders. Hence no client becomes "more important" than some other client, and no DCLS lawyer has any "obvious financial incentive" to favor one client over another. Quite the opposite is true; because a third party pays, the attorney has every incentive to devote his or her entire efforts on behalf of the client.

Second, plaintiffs cite *Klemm* v. *Superior Court* (1977) 75 Cal.App.3d 893, 898 [142 Cal.Rptr. 509]: "As a matter of law a purported consent to dual representation of litigants with adverse interests at a contested hearing would be neither intelligent nor informed." *Klemm*, however, went on to say that

". . . if the conflict is merely potential, there being no existing dispute or contest between the parties represented as to any point in litigation, then with full disclosure to and informed consent of both clients there may be dual representation at a hearing or trial. [Citations.]" (*Id.*, at p. 899.) Besides authorizing consent, *Klemm* does not correspond to a situation in which two or more DCLS attorneys might represent more than one party in a dependency hearing. In *Klemm*, the issue was whether a single attorney could represent both husband and wife in a noncontested dissolution proceeding where both had provided written consent. (*Id.*, at p. 896.)

Third, plaintiffs raise a question about whether DCLS will be regarded as a single "firm" for conflict of interest purposes. Plaintiffs cite ABA rule 1.10, defining a "firm" as those lawyers who "present themselves to the public in a way suggesting that they are a firm or conduct themselves as a firm." By this definition, DCLS cannot be analogized to a "firm." Unlike a private law firm, it is a nonprofit corporation. It is a creation of a public entity, the Board. It does not "present itself to the public" as a law firm; it has only one source of clients in a single kind of legal proceeding, and does not solicit clients or accept referrals from the public. It has been structured so its attorneys and its separate groups have no contact with one another. It is not to be assumed hypothetically, in the absence of facts, that DCLS attorneys will act to violate their client's confidence or to compromise their legal interests. The structures of the organization reinforce this ethical duty, which is well known to all attorneys.

Fourth, concerning possible pressures arising during review of two DCLS counsel's work after a case is closed, disinclination to pursue a costly appeal, or reluctance to charge an opposing counsel with unethical conduct, the very language plaintiffs' brief on appeal uses in raising these points reveals their hypothetical nature. "[T]he attorney might be unwilling to take a certain litigation position . . ."; ". . . one can easily imagine a scenario where . . ."; "A staff attorney might also be disinclined to pursue a costly appeal if. . . ." Speculative contentions of conflict of interest cannot justify disqualification of counsel. (*Kain* v. *Municipal Court* (1982) 130 Cal.App.3d 499, 504 [181 Cal.Rptr. 751].)

*Younger* v. *Superior Court* (1978) 77 Cal.App.3d 892 [144 Cal.Rptr. 34], cited by plaintiff, differs factually from the case at bench. A newly appointed assistant district attorney of Los Angeles County, one of the top three executives in the prosecutorial office, had formerly been a partner in a law firm presently defending between 75 and 200 or more felony cases in respondent court. (*Id.*, at p. 894.) *Younger* affirmed a trial court's ruling disqualifying an entire prosecutorial office from prosecuting criminal cases in which the assistant district attorney or his former law firm had at one time

represented the defendant. *Younger* found that the appearance of a former leading criminal defense attorney near the top of a public prosecutor's office required that any basis for suspicion on this basis be eliminated. (*Id.*, at p. 897.) The circumstances of the case at bench do not create such a suspicious appearance, and make *Younger* inapplicable.

Sixth, concerning the tendency for opposing counsel working in the same office space to develop friendships, exchange information, and share confidences that would affect their professional judgment and their loyalty to and zeal on behalf of their clients, such a tendency likewise remains speculation. One could as easily, and just as speculatively, argue that the competitive, even contentious attitudes of opposing counsel, and their desire to prevail in court, would prevent such friendships from arising or would prevent such shared information or confidences. Furthermore, defendants placed evidence before the trial court that the three DCLS groups would occupy different offices, and that attorneys would be working out of their homes. The trial court credited this evidence, and to its finding we must defer.

Plaintiffs argue that DCLS's representation of opposing parties in a single proceeding will create the appearance of impropriety. Evidence before the trial court indicated that the policy of each law group was to decline representation whenever one of its attorneys had a conflict of interest arising out of pre-DCLS representation of a client. Although they cite former canon 9 of the American Bar Association Code of Professional Responsibility ("A lawyer should avoid even the appearance of professional impropriety"), plaintiffs concede that California has not adopted that standard.

The cases plaintiffs cite are distinguishable on their facts. *Younger* we have already discussed. *People* v. *Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 268-269 [137 Cal.Rptr. 476, 561 P.2d 1164], affirmed the trial court's power to disqualify a district attorney because of a conflict of interest (the victim's mother worked in the district attorney's office, made her grief known to co-workers, knew details of the prosecution's theory of the case, was scheduled to be a material prosecution witness, and stood to gain custody of the child if the defendant was convicted) that might prejudice the prosecutor against the defendant and undermine his impartial exercise of judgment. In *People* v. *Rhodes* (1974) 12 Cal.3d 180 [115 Cal.Rptr. 235, 524 P.2d 363], appointed counsel defending the accused was the city attorney of the county seat of Kings County in which the trial was conducted. *Rhodes* concluded that the interests of criminal defendants and of the criminal justice system are adversely affected when prosecutors defend persons accused of crime, that the city attorney's representation of a defendant was contrary to

public policy, and that defendant's conviction must be reversed. (*Id.*, at p. 183.)

None of these cases has any relevance to the case at bench. Plaintiffs cite no California statutory or judicial authority that the DCLS arrangement would constitute the appearance of, or any actual, ethical impropriety.

In a letter submitted as an exhibit before the trial court, Stephen Gillers, professor at New York University School of Law, responded to defense counsel's request for his opinion on possible ethical problems created by DCLS. Professor Gillers's observations have relevance to this case. "Rules that forbid lawyers to accept matters because of a 'conflict,' and rules that impute a lawyer's conflict to his or her associates, have one paramount object—to prevent lawyers from entering into situations in which they will be seriously tempted to violate a client's right to loyalty and secrecy. Conflict rules try to strike an appropriate balance between protecting against risks to loyalty and confidentiality, on the one hand, and fostering the availability of counsel on the other. Because conflict rules mainly deal with *risk* of unethical conduct, arguments about these rules often use words like 'may,' 'might,' and 'could,' usually followed by phrases like 'be tempted to.' Obviously, such words are highly elastic. They tell us nothing about the appropriate tolerance for risk when measured against the social, professional, and monetary costs of disqualification or of forbidding a particular practice arrangment. We allow many arrangements that tolerate some risk because they also provide social or other benefits and because we are prepared to believe that lawyers take their ethical responsibilities seriously. The question, therefore, is not whether a lawyer in a particular circumstance 'may' or 'might' or 'could' be tempted to do something improper, but whether the likelihood of such a transgression, in the eye of the reasonable observer, is of sufficient magnitude that the arrangement or representation ought to be forbidden categorically."

Plaintiffs also contend that conflicts will result because DCLS staff director Robert Stevenson formerly worked as a team leader with the ALS and learned confidential information about hundreds of abused and neglected children and their families, and many DCLS cases will involve the same children and families.

Stevenson, however, submitted a declaration in the trial court that as one of seven ALS supervisors, he did not have responsibility nor did he learn any confidential information regarding any of the cases handled by ALS other than those he personally handled or supervised. Stevenson's declaration stated that to avoid conflicts of interest, his law group and all DCLS law

groups would not accept representation of any party in which Stevenson previously acted as a supervising ALS attorney, identified as all cases originating in Departments 230 and 231 of Los Angeles County Dependency Court between November 1988 to March 1990. Staff attorneys would check each file to determine the attorneys who previously represented adverse parties, and would not accept representation in any case in which the group head or a staff attorney previously represented an adverse party.

We find no merit to plaintiffs' arguments, and affirm the trial court's denial of the request for preliminary injunction.

## DISPOSITION

The judgment of the trial court denying the request for preliminary injunction is affirmed.

Klein, P. J., and Danielson, J., concurred.