[No. A067247. First Dist., Div. Two. Jan. 9, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
RON DUPRIES CHRISTIAN et al., Defendants and Appellants.

## COUNSEL

Alfons G. Wagner and David J. Briggs, under appointment by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, and Catherine A. Rivlin, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

KLINE, P. J.—Ron Dupries Christian and Dishon Jackson appeal their convictions, following a joint jury trial, of several offenses related to the robbery of a Taco Bell restaurant. Christian's counsel filed an opening brief in which he raised no issues and asked this court for an independent review of the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071]. Jackson contends the trial court erred in permitting the Contra Costa County Public Defender's Office (PD) to represent codefendant Christian and the alternate defender office (ADO) to represent Jackson. According to Jackson, because both offices are under the supervision of Public Defender Charles James, they are not separate entities for conflict of interest purposes, and the joint representation of Jackson and his codefendant denied Jackson the right to conflict-free and independent counsel.

### STATEMENT OF THE CASE AND FACTS

On March 10, 1994, Jackson and Christian approached the counter at a Taco Bell restaurant in Richmond, California. As Jackson ordered some food, Christian pulled a gun on Rudolfo Gomez, who was working behind the counter.[1] Jackson demanded money from Gomez, who gave him money from the cash register. Jackson then jumped over the counter, followed by Christian. Jackson attempted to open another cash register, but was unsuccessful; the clerk opened the register and Jackson took money from it.

Christian went to the back of the restaurant where he demanded that Melvin Lopez, the shift manager, give him money from the safe. Lopez opened the safe and Christian took the money. Jackson also went to the back of the restaurant, where he tried to exit through a back door, but he stopped when Lopez told him an alarm would ring. Jackson then returned to the front of the restaurant, jumped over the counter, and told Christian to "[h]urry up." Christian joined him and they left out the front of the restaurant.

---

[1] In his testimony, Gomez had difficulty recalling the course of events during the robbery.

Richmond police officers responded to reports of the robbery. Officer Mark Granko noticed two men fitting the robbers' descriptions walking through a parking lot. He approached the two men and ordered them to stop, at which point Jackson pulled a handgun from his waistband and dropped it on the ground. Jackson then ran in the direction of a Home Depot store, where he was apprehended. Christian attempted to hide under some shrubbery, but was arrested by Granko.

An information dated April 14, 1994, charged Christian with two counts of robbery pursuant to Penal Code sections 211 and 212.5, subdivision (b),[2] and alleged an enhancement for personal use of a firearm pursuant to section 12022.5, subdivision (a). The personal use enhancement also, it was alleged, precluded Christian's eligibility for probation under section 1203.06, subdivision (a). The information also charged Jackson with two counts of robbery and alleged he was armed with a firearm during the commission of the robberies pursuant to section 12022, subdivision (a)(1). The information further charged Jackson with possession of a firearm by a felon pursuant to section 12021, subdivision (a)(1). Jackson also was alleged to be ineligible for probation under section 1203, subdivision (e)(4) because of two prior felony convictions.

After his arrest, Christian gave a statement to the police in which he implicated Jackson in the robbery. He told police he had handed Jackson some money and the gun after they had left Taco Bell. Based on this statement, Jackson moved to sever his trial from Christian's. However, the prosecutor stated that he would not use Christian's statement at trial unless Christian testified. Neither appellant testified during trial, and the statement was not introduced into evidence.

Christian was represented in the trial court by Deputy Public Defender Jonathan Cooper and Jackson was represented by William Veale of the ADO. Before trial, Jackson moved for substitute counsel under *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], saying that he wanted a court-appointed attorney. The motion was denied. On the second day of trial Jackson made another *Marsden* motion, generally asserting that "there is a conflict of interest here that is involving my case." This motion also was denied.

Following a five-day trial, the jury found Christian guilty of both robbery charges and also found true the personal use enhancements. The jury found Jackson guilty of the first of the two robbery counts (the robbery of Gomez at the front counter) and of being a felon in possession of a firearm.

---

[2]Unless otherwise indicated, all further statutory references are to the Penal Code.

On August 26, 1994, the court found Christian ineligible for probation and sentenced him to the midterm of three years in state prison on the first robbery count and to a consecutive midterm of four years in state prison on the personal use enhancement for a total of seven years. The court also sentenced him to a concurrent midterm of three years on the second robbery count. Finally, the court ordered a lateral transfer of Christian to the California Youth Authority pursuant to Welfare and Institutions Code section 1731.5, subdivision (c).

The court also found Jackson ineligible for probation and sentenced him to the midterm of three years in state prison on the first robbery count, with a one-year enhancement for being armed with a firearm, and to a concurrent midterm of two years on the third count of being a felon in possession of a firearm, for a total of three years.

Both appellants filed timely notices of appeal.

## DISCUSSION

### I.

Christian's attorney has filed an opening brief in which he raises no issues and has asked that we independently review the record. (*People* v. *Wende*, *supra*, 25 Cal.3d 436.) We find no meritorious issues to be argued.

With respect to appellant Christian, we shall affirm the judgment.

### II.

Jackson contends that Charles James, Contra Costa County Public Defender, unconstitutionally failed to provide him with conflict-free, separate and independent counsel because—in light of the fact that Christian was represented by an attorney from the PD and Jackson was represented by an attorney from the ADO—the public defender in effect represented both codefendants. Jackson's basic argument is that Charles James's position as administrative overseer of both the PD and the ADO creates a per se conflict of interest between attorneys in the two offices.

" 'The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation.' [Citation.]" (*People* v. *Mroczko* (1983) 35 Cal.3d 86, 104

[197 Cal.Rptr. 52, 672 P.2d 835]; see also Cal. Rules Prof. Conduct, rule 3-310(C).) "There is a possibility of conflict, then, if the interest of the defendants may diverge at some point so as to place the attorney under inconsistent duties. There is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action." (*Cuyler v. Sullivan* (1980) 446 U.S. 335, 356, fn. 3 [64 L.Ed.2d 333, 351-352, 100 S.Ct. 1708] (conc. and dis. opn. of Marshall, J.).)

Jackson argues that in this case there existed both a potential conflict of interest (had either defendant testified, he would have incriminated his codefendant) and an actual conflict of interest (both defendants attempted to show that the other defendant dropped the gun in front of Officer Granko). Since, according to Jackson, the public defender in effect represented both him and his codefendant without first obtaining their informed consent, the conflicting loyalties that ensued undermined his right to effective assistance of counsel, requiring reversal of the judgment.

## III.

In November 1991, in response to the escalating cost of obtaining legal representation for indigent criminal defendants in conflict of interest cases, the Contra Costa County Board of Supervisors authorized establishment of the ADO.[3] The ADO serves indigent clients who would otherwise be represented by private attorneys appointed through the conflicts panel of the Contra Costa County Bar Association.

At the ADO's inception, the public defender promulgated a policy statement that articulated the nature of the ADO and its relationship to the PD. The policy was disseminated to all staff at both the PD and the ADO. The structure and functioning of the ADO, as explained in the 1991 policy statement, are as follows. Although the ADO is formally a branch of the PD, it operates autonomously, with a separate supervising attorney who is responsible for directing, coordinating, and evaluating the work of attorneys employed by the ADO. This supervising attorney is solely responsible for providing guidance to and determining litigation strategy of ADO attorneys. The public defender exercises no control or influence over the handling of cases by the ADO. Nor does he have access to the client files or other client

---

[3] This information regarding the history and functioning of the Contra Costa County ADO is taken primarily from a 1993 decision of the Contra Costa County Superior Court in People v. Johns (Super. Ct. Contra Costa County, 1993, No. 92-2614-3) and accompanying moving papers, of which we have taken judicial notice pursuant to Evidence Code section 459. Appellant does not specifically challenge the factual accuracy of those moving papers in describing the PD/ADO system.

confidences of the ADO. Only upon the specific recommendation of the ADO supervising attorney may the public defender make changes in the salary or working conditions of persons working for the ADO.

Individual cases in the ADO are opened, litigated, and closed under separate ADO file numbers. The ADO generates calendars listing appearances only for attorneys in the ADO. The ADO has its own clerical support staff and investigators, independent of those employed by the PD. The ADO offices are physically separate from those of the public defender. The keys to the offices of the ADO are different from the keys to the PD offices, and ADO keys are not available to attorneys or support staff not employed by the ADO. The public defender does not personally possess a key to the ADO offices, nor does the ADO supervisor possess keys to the PD offices. The ADO maintains a separate communications network, with its own telephone number, computer hookups to the Law & Justice computer system, facsimile machine, and computer equipment. The ADO also uses independent library facilities.

The files of ADO clients are housed separately from those of the PD to insure that only ADO attorneys have access to the confidential files of the ADO. In turn, files of the primary branches of the PD are protected as separate and likewise inaccessible to ADO attorneys or staff. Every employee of the PD and ADO has been specifically advised to maintain the confidences of individual clients and to be sensitive to the required degree of separation between the ADO and the PD.

In November of 1992, the Contra Costa County Superior Court addressed the validity of the county's PD/ADO system in People v. Johns, *supra*, No. 92-2614-3. The court found the system adequate in all respects, basing its ruling on (1) the applicability to the PD/ADO situation of the Second District Court of Appeal's reasoning in *Castro* v. *Los Angeles County Bd. of Supervisors* (1991) 232 Cal.App.3d 1432 [284 Cal.Rptr. 154]; (2) the fact that the PD and ADO offices were separate offices for the purpose of imputation of conflicts; (3) the policy statement and its implementation created a strict "ethical wall" between the two offices; and (4) the speculation that the system created an unconstitutional conflict of interest was not legally sufficient to justify disqualification of counsel or dismantling of the current system.

IV.

*Castro* v. *Los Angeles County Bd. of Supervisors*, *supra*, 232 Cal.App.3d 1432, on which the trial court in People v. Johns, *supra*, No. 92-2614-3

relied, addressed a question similar to that raised here, regarding alleged conflicts of interest in the context of the juvenile dependency court system. Los Angeles County, in order to save money, had replaced its dependency court conflicts panel system with Dependency Court Legal Services, Inc. (DCLS), a nonprofit organization, which was to represent all parties in dependency proceedings. (232 Cal.App.3d at p. 1436.) Under its operating rules, DCLS had three separate groups, each of which reported, through its individual chain of command, to a common executive director. All three groups received funding through a single administrative unit that handled certain common administrative functions, unrelated to providing legal representation. (*Id.* at pp. 1436-1437.)

However, each group was otherwise autonomous, with attorneys from each group making all decisions regarding the handling of cases within that group; with separate offices, including different addresses and telephone numbers; separate staff and attorneys; separate files, secure from both the other two groups and from the administrative unit; and separate computers. (*Castro v. Los Angeles County Bd. of Supervisors, supra,* 232 Cal.App.3d at pp. 1437-1438.) DCLS represented up to three separate indigent parties in a dependency proceeding, including proceedings where a conflict existed between the parties. (*Id.* at p. 1436.) The plaintiffs, panel attorneys whose services were being displaced by DCLS, sued for declaratory and injunctive relief, claiming that the new system was irreparably flawed because of an inherent conflict of interest between attorneys in the three groups. (*Id.* at p. 1434.)

The Court of Appeal upheld the trial court's denial of a preliminary injunction, finding the doctrine of "vicarious" or firm disqualification inapplicable to DCLS's situation. (*Castro v. Los Angeles County Bd. of Supervisors, supra,* 232 Cal.App.3d at pp. 1440-1441, citing *Klein v. Superior Court* (1988) 198 Cal.App.3d 894, 911-913 [244 Cal.Rptr. 226] and *William H. Raley Co. v. Superior Court* (1983) 149 Cal.App.3d 1042, 1048-1049 [197 Cal.Rptr. 232].) Observing *Raley*'s emphasis that "rulings on disqualifications must proceed according to the circumstances of each case, in light of several competing interests[,]" the court in *Castro* concluded that the kinds of dangers present in cases holding vicarious disqualification necessary did not appear to arise from DCLS's representation of its clients. (232 Cal.App.3d at p. 1441.)

First, the court rejected plaintiffs' analogy of DCLS to a private law firm; since DCLS did not charge clients and received its funding from the county, no DCLS attorney had any financial incentive to favor one client over any other. "Quite the opposite is true; because a third party pays, the attorney has

every incentive to devote his or her entire efforts on behalf of the client." (*Castro* v. *Los Angeles County Bd. of Supervisors, supra,* 232 Cal.App.3d at p. 1441.) The court further noted that the trial court had credited DCLS's evidence of screening measures and "Chinese walls." (*Id.* at p. 1440.)

The court also rejected the plaintiffs' characterization of DCLS as a single "firm" for conflict of interest purposes. (*Castro* v. *Los Angeles County Bd. of Supervisors, supra,* 232 Cal.App.3d at p. 1442, citing rule 1.10 of the American Bar Association Model Rules of Professional Conduct (hereinafter ABA rule 1.10) [defining " 'firm' as those lawyers who 'present themselves to the public in a way suggesting that they are a firm or conduct themselves as a firm' "].) The court found that DCLS was not analogous to the conventional definition of a "firm," in that it was a nonprofit corporation, was a creation of a public entity, did not present itself to the public as a law firm, had only one source of clients in a single kind of legal proceeding, did not solicit clients or accept referrals from the public, and had been structured so its attorneys and three groups had no contact with one another. (232 Cal.App.3d at p. 1442.) "It is not to be assumed hypothetically, in the absence of facts, that DCLS attorneys will act to violate their client's confidence or to compromise their legal interests. The structures of the organization reinforce this ethical duty, which is well known to all attorneys." (*Ibid.*) The court also found the plaintiffs' many examples of situations in which DCLS attorneys *might* find themselves with divided loyalties —such as possible disinclination to pursue a costly appeal or reluctance to charge an opposing counsel with unethical conduct—to be "[s]peculative contentions of conflict of interest [which] cannot justify disqualification of counsel." (*Ibid.*)[4]

Finally, the court rejected the plaintiffs' argument that DCLS's representation of opposing parties in a single proceeding would create the "appearance of impropriety." (*Castro* v. *Los Angeles County Bd. of Supervisors,*

---

[4]The court in *Castro* expanded on this point when, later in its opinion, it quoted from an exhibit in the record, a letter in which New York University School of Law Professor Stephen Gillers had written, in part: " 'Conflict rules try to strike an appropriate balance between protecting against risks to loyalty and confidentiality, on the one hand, and fostering the availability of counsel on the other. Because conflict rules mainly deal with *risk* of unethical conduct, arguments about these rules often use words like "may," "might," and "could," usually followed by phrases like "be tempted to." Obviously, such words are highly elastic. They tell us nothing about the appropriate tolerance for risk when measured against the social, professional, and monetary costs of disqualification or of forbidding a particular practice arrangement. We allow many arrangements that tolerate some risk because they also provide social or other benefits and because we are prepared to believe that lawyers take their ethical responsibilities seriously. The question, therefore, is not whether a lawyer in a particular circumstance "may" or "might" or "could" be tempted to do something improper, but whether the likelihood of such a transgression, in the eye of the reasonable observer, is of sufficient magnitude that the arrangement or representation ought to be forbidden categorically.' " (232 Cal.App.3d at p. 1444.)

*supra*, 232 Cal.App.3d at p. 1443.) The court noted that California had not adopted the "appearance of impropriety" standard found in former canon 9 of the American Bar Association Code of Professional Responsibility regarding a lawyer's duty to avoid the appearance of impropriety and observed, moreover, that plaintiffs had cited no California authority showing that the DCLS arrangement would lead to the appearance of, or any actual, ethical impropriety. (*Id.* at pp. 1443-1444.)

## V.

In attempting to distinguish *Castro* from this case, Jackson first argues that, unlike the PD, DCLS's legal services did not implicate the Sixth Amendment right to conflict-free representation. He also contrasts the nature of DCLS—a nonprofit, public benefit corporation which is free to contract to create three separate offices—with that of the PD, where the Public Defender has a statutory duty to represent indigent criminal defendants and to make decisions relating to conflicts of interest. (See Gov. Code, § 27706, subd. (a); § 987.2, subds. (d) & (e).)

In addition, Jackson asserts that the structure of DCLS differed dramatically from the PD/ADO system, in which Charles James supervises both offices and in which his names appears at the top of pleadings from both the PD and the ADO. Finally, Jackson argues that the court of appeal in *Castro* might have treated the "appearance of impropriety" issue more seriously had it arisen in a criminal context since, as the California Supreme Court has explained, "[i]t is essential that the public have absolute confidence in the integrity and impartiality of our system of criminal justice. This requires that public officials not only in fact properly discharge their responsibilities but also that such officials avoid, as much as is possible, the *appearance* of impropriety." (*People* v. *Rhodes* (1974) 12 Cal.3d 180, 185 [115 Cal.Rptr. 235, 524 P.2d 363].)

Respondent rebuts Jackson's arguments about the inapplicability of *Castro* to the criminal context, first asserting that both the PD and DCLS have a statutory obligation to provide conflict-free representation to their clients. (See Welf. & Inst. Code, § 317, subd. (c); § 987.) Respondent states, moreover, that there is authority suggesting that the right to counsel in Welfare and Institutions Code section 300 proceedings is also constitutionally based (cf. *In re Christina H.* (1986) 182 Cal.App.3d 47, 49 [227 Cal.Rptr. 41]; *In re Ammanda G.* (1986) 186 Cal.App.3d 1075, 1079-1080 [231 Cal.Rptr. 372]), and that Jackson's argument erroneously implies the conflict standard differs for criminal and civil cases. (See discussion to Rules Prof. Conduct, rule 3-310(C) ["Subparagraphs (C)(1) and (C)(2) are intended to apply to all types of legal employment . . . ."].)

Regardless of whether the obligation to provide conflict-free representation in the juvenile dependency proceedings at issue in *Castro* is statutorily or constitutionally based, we find unpersuasive Jackson's attempts to distinguish the present situation from that at issue in *Castro*. The differences between the juvenile dependency proceedings at issue in *Castro* and the criminal proceedings with which we are here concerned are not material. Although a juvenile dependency proceeding is not one which can result in deprivation of liberty, it is one in which highly protected interests are at stake and in which those interests could be seriously prejudiced by a conflict of interest between parents or between a parent and a child. In our view, the reasoning of the *Castro* opinion is largely applicable to the question we confront: whether the PD/ADO system provides representation to indigent criminal defendants that is free from inherent conflicts of interest.

## VI.

Although conflict rules clearly apply both to private and public sector attorneys, they appear to have been drafted with private attorneys primarily in mind. (See *In re Lee G.* (1991) 1 Cal.App.4th 17, 34 [1 Cal.Rptr.2d 375]; *Civil Service Com.* v. *Superior Court* (1984) 163 Cal.App.3d 70, 84 [209 Cal.Rptr. 159].) There are certain distinctions between these two types of practices—public and private—that are relevant to our analysis. In particular, the financial incentive, often present in private practice, to favor a more important client over a lesser one is not an issue for the PD or ADO, given that they are government-funded offices performing services for indigent clients. (See *Castro* v. *Los Angeles County Bd. of Supervisors*, *supra*, 232 Cal.App.3d at p. 1441 [DCLS attorneys have no "obvious financial incentive" to favor one client over another; in fact, because third party pays, attorneys have every incentive to devote entire efforts on behalf of client].)

*Gendron* v. *State Bar* (1983) 35 Cal.3d 409 [197 Cal.Rptr. 590, 673 P.2d 260], relied on by Jackson to demonstrate that a public defender representing multiple defendants with adverse interests commits ethical misconduct, differs in a crucial way from the present case. In *Gendron*, the Madera County Public Defender operated under a contract that essentially required deductions from his own salary for the cost of counsel from outside his office appointed in conflicts cases (*Id.* at p. 415), and, moreover, a single attorney from his office repeatedly represented two or more defendants with conflicting interests. (*Id.* at pp. 416-418; see also *People* v. *Barboza* (1981) 29 Cal.3d 375 [173 Cal.Rptr. 458, 627 P.2d 188].) This clear financial incentive to ignore conflicts, as well as the dual representation by one attorney, distinguish *Gendron* and *Barboza* from the many cases emphasizing that, in

general, courts should not assume the existence of conflicts of interest in the public sector absent evidence of any conflict, and should attempt to limit the reach of disqualification in such cases whenever possible.

As the Court of Appeal explained in *In re Lee G.*, *supra*, 1 Cal.App.4th at page 28, disqualification of public sector attorneys should proceed with caution since such disqualifications can result in increased public expenditures for legal representation. "Where only speculative or minimal benefit would be obtained by disqualification of public counsel, the 'dislocation and increased expense of government' is not justified. [Citation.]" (*Ibid.*; see also *Castro* v. *Los Angeles County Bd. of Supervisors*, *supra*, 232 Cal.App.3d at p. 1442.) A similar standard obtains in the criminal context. In *People* v. *Daniels* (1991) 52 Cal.3d 815, 843 [277 Cal.Rptr. 122, 802 P.2d 906], for example, our Supreme Court rejected a rule of per se disqualification in a case in which the defendant alleged that because a deputy public defender might have to challenge the competence of a former deputy public defender, a conflict existed. The court stated: "We agree with the Illinois Supreme court [in *People* v. *Banks* (1987) 121 Ill.2d 36 (117 Ill.Dec. 266, 520 N.E.2d 617, 620-621)] that a rule of automatic disqualification is unnecessary, and would hamper the ability of public defenders' offices to represent indigents in criminal cases." (*Ibid.*; see also *Love* v. *Superior Court* (1980) 111 Cal.App.3d 367, 371 [168 Cal.Rptr. 577] [particular caution should be exercised before an entire district attorney's office, as opposed to a particular prosecutor, is recused]; *People* v. *Pineda* (1973) 30 Cal.App.3d 860, 865 [106 Cal.Rptr. 743], overruled on other grounds in *Leversen* v. *Superior Court* (1983) 34 Cal.3d 530 [194 Cal.Rptr. 448, 668 P.2d 755] ["[I]n the absence of some affirmative showing that a particular deputy public defender has acquired confidential adverse information about a defendant from the files or other employees of the office, any claim of conflict of interest would be groundless."].)

Thus, in the public sector, in light of the somewhat lessened potential for conflicts of interest and the high public price paid for disqualifying whole offices of government-funded attorneys, use of internal screening procedures or "ethical walls" to avoid conflicts within government offices, such as those found acceptable in *Castro*, have been permitted. (See, e.g., *People* v. *Clark* (1993) 5 Cal.4th 950, 999-1000 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People* v. *Hernandez* (1991) 235 Cal.App.3d 674, 681 [286 Cal.Rptr. 652]; *People* v. *Lopez* (1984) 155 Cal.App.3d 813, 827 [202 Cal.Rptr. 333]; *Love* v. *Superior Court*, *supra*, 111 Cal.App.3d at p. 374.)[5]

In the present case, the record shows that the PD and ADO not only claim to have an ethical separation, but that such a separation in fact exists.

---

[5] A recent draft Restatement by the American Law Institute provides further support for looking beyond the formal relationship of the deputy public defender to the public defender,

As was the case with the executive director of DCLS in *Castro*, the Public Defender of Contra Costa County is nominally in charge of both offices, but in a strictly administrative sense. He is not involved in any way in the day-to-day operation of the ADO. He may not initiate any promotional or disciplinary actions; rather his role is limited to reviewing and acting upon the recommendations of the ADO supervising attorney. In addition, like the three DCLS groups discussed in *Castro*, attorneys from the two offices remain physically apart, have no access to each other's files, and adhere to a well-known policy of keeping all legal activities completely separate. There is no evidence that use of these "ethical walls" have been ineffective in avoiding conflicts of interest between the PD and the ADO.[6] (See *People* v. *Pineda, supra,* 30 Cal.App.3d at p. 865.)

---

arguing for ordinarily treating even deputy public defenders who are part of the same administrative structure within an organization as independent. "In a public defender office, conflict of interest questions commonly arise when the interests of two or more defendants so conflict that lawyers in a private-practice defense firm could not represent the defendants. . . . Where defenders in the same office discuss cases and have access to each other's files, [section] 203(3) would impute their conflicts to each other. In the absence of such access, however, even public defenders who are subject to the same supervisory structure within an organization ordinarily should be treated as independent for purposes of [section] 203(2). The lawyers do not provide legal services to the public defender office; they provide the legal services to the individual defendants. Furthermore, there is ordinarily no reason to believe that the office would have reason to give one defendant more vigorous representation than other defendants whose interests are in conflict. Thus, while individual defendants ordinarily should be represented by separate members of the defender's office, the representation of each defendant should not be imputed to other lawyers in the office." (Rest., The Law Governing Lawyers (Tent. Draft No. 4, Apr. 10, 1991) § 203, com. (d)(iv).)

[6]Furthermore, that the Government Code provides statutory authority for the existence of a public defender, whose mandate is to represent indigent criminal defendants (Gov. Code, § 27706), does not mean that the creation of an alternate defender's office is impermissible or that the public defender himself is personally responsible for the legal representation of each defendant. Nor does *Mowrer* v. *Superior Court* (1969) 3 Cal.App.3d 223 [83 Cal.Rptr. 125], relied on by Jackson, show that the public defender is ultimately responsible, as attorney of record, for each individual case handled by the PD. Rather, in *Mowrer,* the court stressed the independence of each deputy public defender, even though the deputy "derives his authority by delegation from the public defender . . . , whose powers and duties are prescribed by statute." (*Id.* at pp. 230-231.) Again, the public defender's administrative role in overseeing both the PD and ADO should not be mistaken for any kind of direct involvement in the ADO's cases or internal operations.

Jackson also relies for support on a 1976 opinion of the California Attorney General, which concluded that a PD office could not avoid ethical violations by establishing a second division whose sole purpose was to provide representation to a defendant when his or her interests conflicted with a defendant being represented by the first division. (59 Ops.Atty.Gen. 27, 29 (1976).) Even assuming that the scenario envisioned in that opinion was in fact similar to the one at issue here, for the reasons discussed in the text of this opinion, we do not find the Attorney General's reasoning persuasive.

## VII.

██ We also find that the PD and ADO are separate "firms" for purposes of conflict analysis. Again, their structure is remarkably similar to that of the three groups that constituted DCLS and that were found to be distinct firms by the court of appeal in *Castro* v. *Los Angeles County Bd. of Supervisors, supra,* 232 Cal.App.3d at pp. 1441-1442. Like DCLS, the PD and ADO are nonprofit organizations, with a single source of clients in a single type of legal proceeding, and their attorneys practice only in a specific area of law. The PD and ADO are also funded by the county, not by clients, thus eliminating any financial incentive to favor one client over another. Like DCLS, neither the PD nor the ADO solicits clients, nor do they accept referrals from the public. The two offices also have been structured to have minimal contact with each other. (See *id.* at p. 1442.)

Furthermore, as with DCLS, when analyzed under the criteria set forth in the comment to ABA rule 1.10,[7] the PD and ADO do not constitute a single "firm" in that they present themselves to the public as separate entities with separate offices, phone numbers, letterhead, pleading paper, and distinct business cards. The two offices likewise conduct themselves as separate firms. They keep separate confidential files, none of which are cross-accessible, and each office has its own support staff and keeps separate computers, as well as copying and facsimile machines. Importantly supervision of ADO attorneys is the responsibility of the ADO supervising attorney, not the public defender, and neither office consults with the other on general litigation strategy or the handling of individual cases. These rules are reflected in the public defender's policy statement, disseminated to all staff in the PD and ADO. In sum, the two offices are separate "firms," coinciding only for matters of administrative convenience and only at the top administrative level.[8]

---

[7]Paragraph 3 of the comment to rule 1.10 states: "Lawyers employed in the same unit of a legal service organization constitute a firm, but not necessarily those employed in separate units." The California Rules of Professional Conduct are less explicit, defining a "law firm" as, among other things, "a publicly funded entity which employs more than one lawyer to perform legal services." (Rules Prof. Conduct, rule 1-100(B)(1)(d).) The meaning of "entity" is not explained.

[8]Jackson has requested that we take judicial notice, pursuant to Evidence Code section 459, of a report in which the 1992-1993 Contra Costa County Grand Jury recommended that the board of supervisors "[r]equire the monitoring of case decisions arising out of ADO-defended cases, either in this county or elsewhere in the state[,]" and the board responded: "Monitoring of all cases, including those in the ADO, is the responsibility of the Public Defender and is ongoing." We grant Jackson's request for judicial notice, but observe that the report refers to the public defender's monitoring of case *decisions*—an administrative function—and does not imply that the public defender has any sort of involvement in cases in progress in the ADO.

## VIII.

Finally, as our previous analysis shows, Jackson's assertion that Charles James's role as administrative head of both the PD and ADO necessarily impairs the integrity and independence of client representation, and results in both the appearance of and actual ethical impropriety, is without merit. The purpose of the careful separation between the ADO and the PD is to avoid either the appearance of any conflict of interest or any actual ethical impropriety. (See *People* v. *Rhodes*, *supra*, 12 Cal.3d at p. 185.) We conclude that these efforts have been successful.

■ In addition, we have found no evidence of impropriety in the particular circumstances of this case. The record shows that, as Jackson claims, there *was* a potential and actual conflict of interest between him and his codefendant. However, the record also shows that each of the two trial attorneys vigorously defended his client, objecting to the admission of evidence when appropriate and even attempting to implicate each other's client through argument and cross-examination. Both attorneys focused their defense on negating the second robbery charge (from the safe in the back of the restaurant) by alluding to possible embezzlement by Lopez and suggesting the entire incident could not have constituted more than a single robbery; Jackson was in fact acquitted of the second robbery count.

Furthermore, although there was no question as to the identities of the robbers, since the incident had been captured on videotape and was shown to the jury, each attorney attempted to portray the other defendant as the instigator of the crime[9] and to prove that it was the other defendant, and not his client, who had dropped the gun in front of Granko. There is simply no evidence that either attorney represented conflicting interests in his defense of this case.[10] We repeat the admonition of the court of appeal in *Castro*: "Speculative contentions of conflict of interest cannot justify disqualification

[9]Even at the sentencing hearing, each attorney told the judge that the evidence showed the other defendant was the motivating force behind the robbery.

[10]Jackson observes that his codefendant's attorney briefly stood in for Jackson's attorney at a preliminary conference regarding jury instructions. However, as respondent points out, both the court and codefendant's counsel were extremely careful in protecting Jackson's rights during the absence of Jackson's attorney. They both noted several issues upon which Jackson's attorney might wish to be heard and, indeed, the court specifically reviewed many of the instructions with Jackson's attorney when he arrived a few minutes later, and gave him the entire set of instructions to review on his own. This occurrence does not evidence any unethical behavior on the part of the two attorneys or the two offices. Rather, it is merely a routine example of attorneys cooperating with each other and the trial court during one attorney's brief absence from the courtroom. Christian's attorney clearly did not make any tactical or substantive decisions that affected Jackson's defense.

of counsel." (*Castro* v. *Los Angeles County Bd. of Supervisors*, *supra*, 232 Cal.App.3d at p. 1442.)[11]

We thus conclude that Jackson's concerns about an inherent conflict of interest between the Contra Costa County PD and ADO in general, and between the two attorneys in this case in particular, are unfounded.

## DISPOSITION

The judgments are affirmed as to both appellants.

Smith, J., and Phelan, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 11, 1996.

---

[11]Because it is not relevant to the facts in this case, and is based on speculation regarding what *could* happen, we will not address the concerns raised in Jackson's reply brief about the potential for conflicts of interest in cases in which first the PD and then the ADO serially represent the same defendant. (See *Castro* v. *Los Angeles County Bd. of Supervisors*, *supra*, 232 Cal.App.3d at p. 1442.)