[No. G023271. Fourth Dist., Div. Three. Mar. 31, 1999.]

In re ALEXIS W. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
ANN W., Defendant and Appellant.

**COUNSEL**

William M. Roth, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Mitchell L. Beckloff, under appointment by the Court of Appeal, for Minors.

**OPINION**

**SONENSHINE, J.**—The divorce of Ann W. and Jerome W. in 1991 triggered an intense tug-of-war over the couple's substantial wealth and their

children. The youngest two, Alexis and Jennifer, then respectively ages 14 and 9 and in their mother's physical custody, never would have come to the attention of Orange County Social Services Agency (SSA) but for the filing of a police report accusing the father of sexual molestation of the girls. As it turned out, Ann's live-in bodyguard, Hassan C., who has an extensive criminal record, had manipulated the older child into writing a squalid tale which she recanted shortly thereafter. Sadly, by then, the dependency petitions had been filed and the girls detained due to the allegations against the father, the mental instability and alcoholism of the mother, and the unsuitability of her home.[1]

SSA filed a first amended petition deleting sexual abuse references after Jerome voluntarily submitted to a lie detector test, Alexis recanted and Jennifer denied any knowledge of inappropriate conduct. The petition alleged substantial risk to the minors as a result of Ann's failure to adequately supervise and protect them, her inability to provide regular care due to her mental health problems, and Jerome's inability to protect the children due to Ann's having physical custody. The petition further recited Ann's history of alcohol- and mental-health-related hospitalization, noted her "negative comments about the father in the [minors'] presence," and alleged Hassan was in Ann's home because "[Ann] believes she is in danger from her former husband, due to a physical attack by her adult son which she believes was instigated by [Jerome]." Finally, the petition alleged "[Jerome's] relationship with his daughters has deteriorated since the parents' divorce as he has not understood their need for privacy."

Both parents pleading no contest, the court adjudicated jurisdiction in October and ordered Evidence Code section 730 evaluations of the minors and Ann, the latter to assess whether she suffered any mental illness which might impact her ability to parent the girls. The court also ordered conjoint counseling for all family members and individual counseling for Alexis and Jennifer. Jerome voluntarily submitted to and paid for his own psychological evaluation by the court-appointed psychologist, Kenneth Fineman, Ph.D. The matter was continued for a contested dispositional hearing.

Alexis and Jennifer, intially placed at OCH, were transferred to a foster home. Hassan continued to live in Ann's house for some time, although he

---

[1]While the girls were being interviewed and examined at Orangewood Children's Home (OCH), Hassan was observed masturbating in the facility's lobby. He then went to the parking lot where he donned a bulletproof vest. Police officers, summoned to the scene, found two unloaded handguns in his car. When Ann was told about the incident, she initially refused to believe it, indicating Jerome might have somehow concocted it to discredit her and Hassan. The petitions alleged Ann "did not understand that [Hassan's] behavior was inappropriate . . . . [and she] placed the minor[s] at risk by leaving [them] in the care of the bodyguard."

eventually moved out. In November, Fineman concluded Alexis had been "lying, coached, or significantly disturbed" in relation to the sexual abuse charges. The court ordered unmonitored visitation between father and daughters. Ann's visitation continued to be monitored, due in part to her having given Alexis an "inappropriate" letter from Hassan and having disregarded the court's admonitions against talking to the children about the court proceedings or her ex-spouse.

In mid-December, Alexis and Jennifer, against their express wishes, were released to Jerome's custody under a family maintenance plan. A few weeks later, Fineman submitted his 35-page report concluding Ann suffered from "significant psychiatric dysfunctions" which caused her to focus on satisfying her own needs, to the detriment of the needs of her children. As an example, Fineman noted the mother's "continued relationship with [Hassan], in spite of his behavior and the loss of her children." The psychologist also alluded to Ann's manipulation of the girls, such as demonizing their father and, in the years since the divorce, depriving them of their visits with him by arranging for them to be busy with something else at the scheduled times. Fineman assumed there was a "significant attachment" between mother and daughters and noted the warmth in their relationship, as opposed to a cooler climate in their interaction with their father. Yet he did not believe Ann should even have unmonitored visits, much less custody, until she completed numerous parenting courses, a 12-step program, and long-term individual psychotherapy yielding measurable progress in specific areas.[2]

On January 7, 1997, the minors were declared dependents of the juvenile court. Custody remained vested with the father. By stipulation, the court ordered a family reunification plan for Ann, although, at the six-month in-home periodic review hearing in July, it corrected the misnomer, noting the case was actually proceeding under family maintenance as to the father. It struck the reference to reunification for Ann, replacing it with, "Case plan for mother is to enhance [the] family relationship."

For the next review hearing, SSA reported both parents were cooperating and progressing well. It recommended termination of jurisdiction, the father to have sole physical custody. The social worker noted, "[T]he minors have been well cared for by their father. On each occasion [of the social worker's visits], the minors have stated that they do feel safe living with their father

---

[2]SSA's court report summarized Fineman's evaluation, stating in part, "[Ann] is reported to maybe becoming so preoccupied by her anger at [Jerome] and her belief that he has molested the children and her belief that he continues to deprive her of appropriate financial assistance that the children may suffer significant emotional dysfunction because of lack of awareness of their psychological needs and thus her neglect of their emotional needs."

and that everything is going reasonably well there. However, the minors have also consistently expressed their desire to live with their mother . . . . [¶] [The minors'] counselor . . . has indicated that she does not feel that it is right that the minors should have to choose which of their parents they want to live with. [She] also . . . feels it is very important that the minors remain in their current schools and that ideally the parents should be able to share the custody of the minors, and, that perhaps, the parents could participate in mediation to affect this joint custody."

In conjunction with the review hearing, Ann's counsel filed a modification petition under Welfare and Institutions Code section 388.[3] Although the motion did not mention the issue of the children's best interests, it argued Ann had completed "sufficient counseling and parenting classes so as to remove any risk of harm" from placement with her. She sought their removal from Jerome's custody and their return to her. When the matter was called for a hearing, Ann's counsel agreed not to proceed on the petition, but to have its issues considered in the context of the custody issues in the review hearing. The court stated it would treat the petition as a trial brief for that purpose.

In response to Ann's petition for return of the children, SSA modified its recommendation: If the court decided to leave the minors in Jerome's custody, SSA advocated termination of jurisdiction; if, on the other hand, the court determined the children should be placed with Ann, then continued supervision would be necessary.

The matter was heard in January and February 1998. The court advised counsel that should it conclude termination of dependency jurisdiction was appropriate, it would "leave[] open all issues that might be covered by an exit order." It then heard the testimony of Social Worker Mark Pompeo. Pompeo stated his preference the children be returned to Ann because she had asked for them, they had consistently repeated their desire to live with her, their attachment was stronger to her than to Jerome, and Ann had cooperated with her case plan. But Pompeo admitted he had never talked to Fineman or inquired about his opinion the mother had a very long way to go before she would have the parenting skills and mental stability to take care of her children. And despite his extensive contacts with the mother's therapist, Tony Denise Murray-Meredith, he never asked her to comment on Fineman's conclusions about Ann's disordered thinking, problems with impulse control, poor judgment and emotional dysfunction. As a matter of fact, he stated Fineman's report played a "very small part" in his thinking.

Pompeo acknowledged he had "no information" Ann had resolved any of her various mental health problems. He admitted that after Alexis recanted

---

[3]All further statutory references are to the Welfare and Institutions Code.

her sexual abuse accusation, the mother made obviously incredible accusations that Jerome, during the course of their marriage, had sex with a dog, with their then adolescent son's boyfriend, and later, when the same son was 20 or 21 years old, with his girlfriends. Although Pompeo found these accusations unbelievable, he was unconcerned. He continued to recommend placement with Ann, relying on Murray-Meredith's reports to the effect that the mother had generally made "progress in counseling." Yet he admitted Murray-Meredith herself made no recommendation, one way or the other, for the minors' placement. And he further admitted the children were doing well in their father's home, where Jerome was providing appropriate care. When asked if he "would rather have the children remain dependents and children of the system because of [their] expressed preference [to live with their mother] than have them remain in their father's home where they are safe and stable with dependency terminating," Pompeo responded, "That's my recommendation."

At the conclusion of the hearing, the court found SSA failed to meet its burden of showing dependency jurisdiction should continue. Before scheduling further proceedings, it advised counsel, "[I]n light of the court's ruling, if any party feels the need to regroup in order to present their case on exit orders, I would certainly consider giving you additional time in that regard." It invited counsel to state their respective positions. SSA made no recommendation on exit orders at that time, although its January report had recommended joint legal custody, with Jerome having sole physical custody and Ann unmonitored weekends with Alexis and Jennifer. Minors' counsel, noting there appeared to be no possibility of the parents mutually resolving the custody dispute, observed the court was going to have to make the decision and concurred with the recommendation contained in SSA's earlier report. The mother's counsel stated evidence would show Ann's "purported mental problems have been addressed sufficiently in counseling," and urged the court to honor the minors' request to live with her.

Concluding the hearing, the court obtained the agreement of all counsel to order the parents into mediation. Cautioning Ann and Jerome about prolonging "the atmosphere of animosity" to which they had subjected their children for years, it encouraged them "to participate in good faith," "step outside" themselves, and come to terms with the fact they would "have to deal with one another in some respect until these children are 18." The court then asked the parents to take advantage of the chance to be "positive role models" by putting aside their differences, and it warned that if mediation did not resolve the matter, the court was "not afraid to make the hard calls," which might well result in both of them "walk[ing] out unsatisfied."

Unfortunately, mediation failed. At the continued hearing in April, Murray-Meredith testified the mother had participated in weekly counseling for

16 months, resulting in a changed viewpoint and attitude. The therapist opined return of the minors to Ann would be good for the mother because it would relieve some of her "external stressors," but she admitted she had insufficient information to render an opinion as to what would be in the children's best interests. She claimed no expertise in interpreting psychological testing results, thus, while she had reviewed Fineman's report, she had no basis for deciding the value of his conclusions. In her sessions with Ann, her main focus was to get the mother to do all the components of her service plan. Accepting Ann's version of the family's history without question, she never interviewed Jerome, Alexis, Jennifer or anyone else: Pompeo was the only person she talked to. She kept virtually no notes of the therapy sessions, writing down only those things she was afraid she might later forget. She had no written statement of objectives, assessments or observations. She recommended Ann participate in a 12-step program, but said Ann was too busy to work it into her schedule. Although Murray-Meredith believed the mother had "worked very hard and . . . made some progress," the therapist admitted she could not make a placement recommendation since some of Ann's problems remained unresolved.

At the parties' stipulation, the court took judicial notice of the family law court's dissolution file "to observe the status . . . to the extent it sheds light on the issues of bias and motivation." In closing argument, SSA, although acknowledging the need for another six months of supervision, nonetheless sought the minors' return to the mother's sole physical custody, even without supervision. Jerome's counsel, pointing to the history of how the case came into the dependency court, emphasized Fineman's conclusions about Ann's paranoia, hypochondria, thought disorders and instability, and her need for long-term psychotherapy. Minors' counsel agreed, observing Alexis and Jennifer were in a stable environment and there was "absolutely no shred of evidence to change the current status, be it minors' best interests, or detriment." Requesting physical custody with the father and visitation with the mother, "as it has been going," counsel conceded her clients had "many times said that they want to return to mom." But, she added, "I don't believe children should always make these decisions. I believe it's up to the court. And I cannot represent to the court pursuant to [section] 317 that it wouldn't be detrimental or [would] be in their best interests" to live with Ann.

On April 24, having given the matter due consideration, the court offered everyone a final chance to add anything that might have happened in the two-month interim to change the status of the case. None took advantage of the opportunity. The court then announced its decision, determining the parents "should have joint legal custody, with physical custody to father and

reasonable visitation for mother." It left it up to the parties to work out a mutually agreeable visitation schedule, adding, "If the parties cannot agree on what that visitation schedule is, a copy of the court's order is going to be in the family law file," and advised the parties to direct "any request to modify or to enforce this court's orders" to that division of the court.

### Discussion

■ Ann contends the court abused its discretion in denying her section 388 petition. She either waived the issue or invited the error of which she now complains. As we have noted, Ann's counsel agreed the court could treat the petition as a trial brief on custody and deal with the issues and evidence in the context of the review hearing.

Additionally, Ann's argument fails on its merits. A party seeking change of custody under section 388 has the burden of showing not only that circumstances have changed, but that return would be in the child's best interests. Ann correctly claims she underwent counseling, completed parenting classes, maintained regular contact with the children, and they wanted to live with her. But there is substantial evidence supporting the court's conclusion the "best interests" test was not met. The minors were safe and sound in their father's home, and there was no cause to place them in Ann's care, where, according to Fineman, they would be at risk. Indeed, neither Ann's therapist nor her social worker could affirmatively attest to the suitability of the requested placement, both indicating more time and further supervision was needed.

■ Ann's only other contention is the minors received ineffective assistance of counsel because their attorney advocated a position contrary to their expressed placement wishes. But counsel's position was supported by the evidence, and under section 317, subdivision (e), a minor's counsel must not only advise the court of the minor's wishes, but must make recommendations "concerning the minor's welfare." If the Legislature intended counsel to advocate solely on the wishes of children of a certain age, it would not have included the following prohibition in the statute: "Counsel for the minor shall not advocate for the return of the minor if, to the best of his or her knowledge, that return conflicts with the protection and safety of the minor." As the court observed in *In re David C.* (1984) 152 Cal.App.3d 1189, 1208 [200 Cal.Rptr. 115], "The role of counsel for the child [in dependency proceedings] is not merely to act as a mouthpiece for the minor . . . ." Even were there no statutory or decisional precedent, we would find it self-evident counsel may not advocate a position he or she has reason to believe might endanger the child.

Moreover, the court was not in the dark about the closeness of the minors' relationship with their mother and their strong desire to live with her. No doubt it weighed that information against less favorable evidence. The evidence, taken as whole, leads us to conclude the court fashioned appropriate exit orders.

Finally, a party seeking reversal based on ineffective assistance of counsel must show the alleged failure to provide adequate representation resulted in prejudice. (See *Adoption of Michael D.* (1989) 209 Cal.App.3d 122, 136 [256 Cal.Rptr. 884].) Even assuming counsel should have advocated for the children's placement wishes here, we still cannot say Ann was harmed by her failure to do so.

## *Conclusion*

The juvenile court properly terminated dependency jurisdiction over what all agreed was a child custody case. (Cf. *In re John W.* (1996) 41 Cal.App.4th 961 [48 Cal.Rptr.2d 899].) The court also aptly noted the parents, if dissatisfied with the exit orders, needed to seek recourse in the family law court.

Before sending them on their way, we urge them to heed the court's plea to put down their arms, allow their old wounds to heal, and, at long last, turn their attention to the needs of Alexis and Jennifer, whose time to be children has nearly run out.

The termination and exit orders are affirmed.

Sills, P. J., and Crosby, J., concurred.