62 Cal.Rptr.3d 704 (2007)
153 Cal.App.4th 70
In re ZAMER G., et al., Persons Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
S.B., et al., Defendants; Children's Law Center, Objector and Appellant.
No. B194885.
Court of Appeal of California, Second District, Division Five.
July 10, 2007.
*706 Akin Gump Strauss Hauer & Feld, Rex S. Heinke and Seth M.M. Stodder, Los Angeles, for Appellant.
Raymond G. Fortner, Jr., Los Angeles County Counsel, Tracey Dodds, Principal Deputy County Counsel, for Respondent Department of Children and Family Services.
Merrill Lee Toole, under appointment by the Court of Appeal, Monrovia, for Minor Zamer G.
Aida Aslanian, under appointment by the Court of Appeal, Glendale, for Minors Nay. H. and Naes. H.
Christopher Blake, under appointment by the Court of Appeal, San Diego, for Minors Joshua E. and Justin E.
MOSK, J.

INTRODUCTION
This is one of eight recent appeals brought by the Children's Law Center of *707 Los Angeles (the Center or CLC), all from orders of the juvenile court disqualifying the Center from representing children in dependency proceedings because of purported conflicts of interest. The Center created independent unitsreferred to as CLC Unit 1, CLC Unit 2 and CLC Unit 3to provide, in the same proceeding, legal representation to multiple clients who might have conflicts of interest.[1]In In re Charlisse C. (2007) 149 Cal.App.4th 1554, 58 Cal.Rptr.3d 173 (Charlisse) and In re Jasmine S. (2007) 152 Cal.App.4th 297, 61 Cal.Rptr.3d 256 (Jasmine), we reversed the juvenile court's orders disqualifying the Center in cases involving, respectively, the successive representation of two clients with adverse interests, and the concurrent representation of two clients with potentially adverse interests.
This case involves the concurrent representation by two of the Center's independent units of five siblings. We affirm the juvenile court's order disqualifying CLC Unit 1 from representing four of the siblings because the record contains substantial evidence of an actual conflict among those four siblings. We reverse, however, the juvenile court's order disqualifying CLC Unit 2 from representing one sibling because we hold there is not a material breach in the Center's ethical screens to justify treating CLC Unit 1 and CLC Unit 2 as a single law firm for conflict purposes in this case.

BACKGROUND
Our prior opinions set forth relevant facts relating to the Center and the evidence upon which the juvenile court based its decision that the Center violated the ethical safeguards set forth in Castro v. Los Angeles County Bal. of Supervisors (1991) 232 Cal.App.3d 1432, 1435-1445, 284 Cal.Rptr. 154 (Castro), and People v. Christian (1996) 41 Cal.App.4th 986, 991-1002, 48 Cal.Rptr.2d 867. (See Charlisse, supra, 149 Cal.App.4th at pp. 1560-1564, 58 Cal.Rptr.3d 173 (lead opn. of Mosk, J.) and pp. 1583-1599, 58 Cal.Rptr.3d 173 (dis. opn. of Turner, P.J.); Jasmine, supra, 152 Cal.App.4th 297, 61 Cal.Rptr.3d 256, 257-261.)[2] We set forth additional facts that relate to the disqualification order in this case.
The Center is a publicly funded, nonprofit law office that represents parties in the Los Angeles County Juvenile Dependency Court when legal services are required under Welfare and Institutions Code section 317.[3] The Center formerly was called Dependency Court Legal Services. Pursuant to two agreements, first with the Los Angeles County Board of Supervisors and now with the Administrative Office of the Courts, the Center has been structured into three independent units, designated CLC Units 1, 2, and 3, to permit the Center to provide legal representation *708 to multiple children in the same dependency proceeding, even if the children have conflicting interests.[4]
This case involves five children (collectively children), who lived with their mother (mother) and Nah. H. The children have three different fathers. Joshua E. and Justin E., aged seven and four respectively, are the children of Joshua E., Sr.; three-year old Zamer G. is the child of Zack G.; Naes. H. and Nay. H., aged one and four months respectively, are the children of Nah. H.
On June 23, 2006, the Los Angeles Police Department and the Los Angeles County Department of Children and Family Services (DCFS) responded to a report of child abuse at a motel room and found that Zamer had suffered a fractured right femur falling in the bathtub. Zamer was transported to the hospital. When interviewed, Zamer said he was pushed, although he did not say by whom; he later told a DCFS social worker that Nah. H. "hit him and he went into the tub." Nah. H. stated that he had been giving Zamer and Justin a bath, and that he had taken Justin out of the bath and into another room when Zamer fell and injured himself trying to get out of tub. Justin, however, told a DCFS social worker that he was in the bathroom when Zamer fell. The physicians who examined Zamer opined that his injuries were not consistent with the explanation given by Nah. H., and stated that Zamer also exhibited bruising that "did not look new" and that had occurred prior to Zamer's fall. The physicians could not determine, however, whether the injuries were accidental, or caused by abuse.
DCFS detained all of the children. On June 28, 2006, DCFS filed a petition pursuant to section 300 with respect to all five children. The petition alleged, in essence, that Zamer had been hospitalized due to physical abuse by mother and by Nah. H., and that all of the children were at risk of severe harm. Prior to the detention hearing, DCFS filed an Addendum Report recommending no reunification services for either mother or Nah. H. The report recounted a social worker's interview with Justin, in which Justin said that his "daddy" (presumably referring to Nah. H.) had "whopped [his] brother" (presumably Zamer) with a rolled towel because Zamer had "peed on himself." Justin further stated that he, too, had been hit, and that he had seen "his father" hit his siblings and his mother.
At the detention hearing on June 28, the juvenile court stated its intention to appoint Archana Gupta of CLC Unit 2 to represent all five of the children. Gupta responded, "This is a detention. I'm available to take Zamer. I believe Mr. Feldman [of CLC Unit 1] is taking the other children." The juvenile court appointed Gupta to represent Zamer only, and appointed Feldman to represent Joshua, Justin, Naes. and Nay.
Of the children's three fathers, only Nah. H. attended the detention hearing. He requested and was granted presumed-father status with respect to Naes. and Nay. DCFS did not then know the whereabouts of Joshua E., Sr., the father of *709 Joshua and Justin.[5] Zamer's father, Zack G., was incarcerated in state prison. Mother requested that the children be placed with her sister; Nah. H. requested that his children, Naes. and Nay., be placed with his mother. Feldman requested that all five children be kept together. The juvenile court ordered DCFS to evaluate the homes of mother's sister and of Nah. H.'s mother, and whether it would be possible to keep the children together.
Prior to the pretrial resolution conference (PRC) on July 27, Joshua was placed in a foster home; Justin, Naes. and Nay. were placed together in another foster home; Zamer remained hospitalized. DCFS submitted a report setting forth witness statements to substantiate the allegations in the petition. Joshua and Justin both stated that Nah. H. had struck both of them and Zamer. Justin also stated, "He don't sock Nas. [sic ] because she's a baby, but he pops her real hard." DCFS recommended that no family reunification services be provided to Nah. H., but reported that mother could benefit from such services.
At the PRC, Gupta, Zamer's CLC Unit 2 attorney, requested an evaluation of Zamer's paternal grandmother for potential placement for Zamer only. The juvenile court granted Gupta's request.
DCFS filed a First Amended Petition on August 25. The First Amended Petition alleged that mother and Nah. H. had physically abused Joshua and Justin in addition to abusing Zamer. There were no allegations that Naes. or Nay. had been abused. Prior to the PRC on the amended petition, DCFS reported that, although Zamer's grandmother was not yet approved for placement, she was willing to care for Zamer when he was released from the hospital. Joshua's foster parent was not willing to accept Zamer; the foster parent for Justin, Naes. and Nay. was willing to accept Joshua, but had not been consulted about accepting Zamer. DCFS further reported that it could "not make a definitive conclusion regarding the child Zamer's injuries," but believed "it is likely that father Nah. [H.] ... cause [sic ] the injuries to this child."
At the PRC, the juvenile court ordered DCFS to place Zamer either with his siblings or with his paternal grandmother. The juvenile court set a contested hearing on the amended petition for September 26.
On September 26, DCFS submitted a packet of "last-minute information" to the juvenile court. Among the documents submitted was a report from Dr. Karen Imagawa of Children's Hospital Los Angeles, stating that Zamer had described incidents of physical abuse inflicted on him by a person called "12." Joshua and Justin identified "12" as Nah. H.
Prior to the September 26 hearing, both Joshua and Zamer were placed in the foster home with their siblings. Joshua, however, was subsequently removed due to behavioral problems and returned to his prior placement. At the September 26 hearing, the juvenile court learned that Joshua E., Sr. (the father of Joshua and Justin) had been released from prison but had not received notice of the hearing. The court therefore continued the contested hearing on the petition to November 1, and ordered that notice be given to Joshua E., Sr. Feldman (the CLC Unit 1 attorney for all the children except Zamer) raised the issue of Joshua's removal from the foster home, and requested that DCFS continue to seek a placement where all five children *710 could be together. The juvenile, court stated, "I don't know whether or not there's a conflict becausewhat if they like living where they are and they don't want to get moved?" The juvenile court nevertheless ordered DCFS to "explore placing all children together and whether be [sic ] in the best interest." The juvenile court did not raise the issue of disqualification, nor did any of the attorneys or parties object to the Center's continued involvement in the matter.
The matter was called for the contested hearing on November 1. Marc Leftwich, the unit head of CLC Unit 2, appeared with Gupta as co-counsel for Zamer. CLC Unit 1 attorney Feldman appeared for the other children. Joshua E., Sr.the father of Joshua and Justin who recently had been released from prisonwas present. Panel attorney Katie Baca announced that she was "seeking appointment on behalf of Joshua E., Sr. The juvenile court told her, "You're appointed to represent [Joshua E., Sr.]."
Although no motion or order to show cause had been made for the Center's disqualification, Feldman began the hearing by stating, "I know this court intends to remove us [the Center] ... as counsel for the minors. I just want to state for the record that CLC objects that there's any actual or structural conflict and that if, your honor, wants to seek a waiver it is our position that"
The juvenile court interrupted, "I don't want to seek a waiver.... It's not my business or job to resolve the conflict other than to make sure there is no conflict or whatever conflict exists.... I found that there was a structural conflict problem...." Feldman requested that the juvenile court appoint a guardian ad litem for the minors to explore the possibility of waiving the "structural" conflict. The juvenile court denied Feldman's request, stating that appointing a guardian ad litem "costs taxpayers more money.... My decision was not made, franklydid not consider the fiscal consideration, considered just the structure vis-à-vis Castro [supra, 232 Cal.App.3d 1432, 284 Cal.Rptr. 154] and what Castro required." Leftwich (the head of CLC Unit 2) stated, "We do not believe that there is a conflict, either actual or structural. And we do not believe that a waiver is required in this case or any other case of this nature." The juvenile court announced, "Your objection is noted. [¶] I am going to relieve CLC 1."
After disqualifying CLC Unit 1, the juvenile court then asked, "Is there a conflict between the children, is that the basis for this problem?" Feldman responded that there had been a conflict at the outset of the case between Zamer, on the one hand, and his half-siblings, on the other, because Zamer had been injured. Counsel for Nah. H., however, stated her belief that there was a conflict between Joshua and Justin, on the one hand, and Naes. and Nay., on the other handthat is, among the four children represented by CLC Unit 1because Joshua and Justin allegedly had been abused by Nah. H., the father of Naes. and Nay., and presumably would testify against Nah. H. Feldman, the CLC Unit 1 attorney, volunteered that he had received confidential information from his "two verbal clients" (presumably, Joshua and Justin).
The juvenile court reiterated that CLC Unit 1 was relieved as counsel. Leftwich reiterated that Unit 2 wanted to remain on the case. The juvenile court stated that it would "think about" whether CLC Unit 2 would be disqualified from representing Zamer.
The juvenile court then reversed its prior decision to appoint Baca to represent Joshua E., Sr. Instead, the juvenile court appointed Baca to represent all four of the children formerly represented by *711 CLC Unit 1, and appointed a new attorney to represent Joshua E., Sr. Prior to issuing its minute order, however, the juvenile court reconsidered its decision yet again. The November 1 minute order indicates that the juvenile court disqualified both CLC Unit 1 and CLC Unit 2; that Baca was appointed to represent Joshua and Justin only (even though Baca had been representing Joshua E., Sr., whose interests were adverse to Joshua and Justin);[6] and that another panel attorney was appointed to represent Naes. and Nay. The Center timely appealed.

DISCUSSION

A. Standard of Review
"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. *712 [Citation.]" (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135, 1143-1144, 86 Cal.Rptr.2d 816, 980 P.2d 371 (SpeeDee Oil); see also City and County of San Francisco v. Cobra Solutions, Inc. (2006) 38 Cal.4th 839, 848, 43 Cal.Rptr.3d 771, 135 P.3d 20 (Cobra Solutions).)[7]

B. The Juvenile Court Did Not Abuse Its Discretion in Disqualifying CLC Unit 1

1. General Principles

A minor's right to appointed counsel in dependency proceedings is guaranteed by section 317. Section 317, subdivision (c) provides, in relevant part, that a child in dependency proceedings is entitled to appointed counsel "unless the court finds that the child would not benefit from the appointment of counsel.... A primary responsibility of any counsel appointed to represent a child pursuant to this section shall be to advocate for the protection, safety, and physical and emotional wellbeing of the child. Counsel for the child may be a district attorney, public defender, or other member of the bar, provided that the counsel does not represent another party or county agency whose interests conflict with the child's interests." Once appointed, "[c]ounsel shall continue to represent the ... child unless relieved by the court upon the substitution of other counsel or for cause." (§ 317, subd. (d).)
In In re Celine R. (2003) 31 Cal.4th 45, 1 Cal.Rptr.3d 432, 71 P.3d 787, the California Supreme Court construed the phrase "whose interests conflict with the child's interests" in section 317, subdivision (c) to refer to an actualnot a potentialconflict of interest. (Id. at p. 56, 1 Cal. Rptr.3d 432, 71 P.3d 787.) The Supreme Court recognized that section 317 "appeals] to differ slightly" from California Rules of Professional Conduct (GRPC), rule 3-310(C), governing the concurrent representation of conflicting interests. Unlike section 317, CRPC rule 3-310(C) prohibits a lawyer from representing clients with potential conflicts, as well clients with actual conflicts, without the clients' informed written consent.[8] (See In re Celine R., supra, 31 Cal.4th at pp. 56-57, 1 Cal.Rptr.3d 432, 71 P.3d 787.) The Supreme Court reconciled the two provisions, holding, "When first appointing counsel [for multiple siblings] in a dependency matter, the court may generally appoint a single attorney to represent all the siblings. It would have to appoint separate attorneys if, but only if, there is an actual conflict among the siblings or if circumstances specific to the casenot just the potential for conflict that inheres in all multi-sibling dependency cases present a reasonable likelihood an actual conflict will arise. If these specific circumstances exist, the court should appoint separate counsel at the outset rather than await an actual conflict and the possible disruption a later reappointment may cause. After the initial appointment, the court will have to relieve counsel from *713 multiple representation if, but only if, an actual conflict arises." (Id. at p. 58, 1 Cal.Rptr.3d 432, 71 P.3d 787.)[9]
The holding of In re Celine R., supra, 31 Gal.4th 45, 1 Cal.Rptr.3d 432, 71 P.3d 787 was codified and expanded upon in California Rules of Court, rule 5.660(c).[10] Rule 5.660(c) is titled, "Conflict of interest guidelines for attorneys representing siblings." The rule, insofar as relevant here, provides that "[t]he court may appoint a single attorney to represent a group of siblings involved in the same dependency proceeding." (Rule 5.660(c)(1)(A).) The attorney has, however, "an ongoing duty to evaluate the interests of each sibling to assess whether there is an actual conflict of interest." (Rule 5.660(c)(2)(A).) Further, "[i]f the court determines that an actual conflict of interest exists, the court must relieve an attorney from representation of some or all of the siblings." (Rule 5.660(c)(2)(E).) It is not necessary, however, for counsel to withdraw after appointment "if there is merely a reasonable likelihood that an actual conflict of interest will develop." (Rule 5.660(c)(2)(C), italics added.) Accordingly, whether the juvenile court properly disqualified CLC Unit 1 in this case turns on whether an actual conflict existed between two or more of the four children represented by CLC Unit 1. (See Discussion Part B.2 post.)
Courts and dependency lawyers applying the standard set forth in Rule 5.660(c) and In re Celine R., supra, 31 Cal.4th 45, 1 Cal.Rptr.3d 432, 71 P.3d 787 confront two problems. The first is determining whether the circumstances in a particular multi-sibling dependency case give rise to a conflict. In civil or criminal cases involving multiple representation, a conflict typically arises when the circumstances of a particular case present "a substantial risk that the lawyer's representation of the client would be materially and adversely affected by ... the lawyer's duties to another current client...." (Rest.3d of the Law Governing Lawyers, § 121, italics added; see Charlisse, supra, 149 Cal.App.4th at p. 1566, 58 Cal.Rptr.3d 173 (lead opn. of Mosk, J.); see also Flatt v. Superior Court (1994) 9 Cal.4th 275, 282, fn. 2, 36 Cal.Rptr.2d 537, 885 P.2d 950 ["`a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose'"].) The difficulty faced by counsel representing minors in dependency proceedingsparticularly lawyers who represent children who lack the maturity to understand the proceedings or to participate meaningfully in the representationis that the paramount duty of counsel for minors is not zealously to advocate the client's objectives, but to advocate for what the lawyer believes to be in the client's best interestseven when the lawyer and the client disagree. (See, e.g., § 317, subd. (e) ["Counsel for the child shall not advocate for the return of the child if, to the best of his or her knowledge, that return conflicts with the protection and safety of the child"]; In re Josiah Z. (2005) 36 Cal.4th *714 664, 673, 31 Cal.Rptr.3d 472, 115 P.3d 1133 ["The best interests of the child are paramount"]; In re Alexis W. (1999) 71 Cal. App.4th 28, 36, 83 Cal.Rptr.2d 488 ["`The role of counsel for the child [in dependency proceedings] is not merely to act as a mouthpiece for the minor....' Even were there no statutory or decisional precedent, we would find it self-evident counsel may not advocate a position he or she has reason to believe might endanger the child"]; In re Candida S. (1992) 7 Cal.App.4th 1240, 1253, 9 Cal.Rptr.2d 521 ["the obligation of counsel for a dependent minor is to pursue whatever is in the minor's best interest. This may or may not be what the minor wishes"]; In re Richard H. (1991) 234 Cal.App.3d 1351, 1368, 285 Cal. Rptr. 917 ["the preference of the minor is not determinative of his or her best interests"]; In re David C. (1984) 152 Cal. App.3d 1189, 1207-1208, 200 Cal.Rptr. 115 ["Certainly, counsel for the minor must take into consideration the child's wishes when determining what the child's best interests are. This does not mean that, after independent consultation, reflection and study, counsel for the minor cannot urge that the child's best interests would be fostered by termination of parental rights, contrary to the stated desires of the child. The role of counsel for the child is not merely to act as a mouthpiece for the minor child"].)
Counsel's paramount duty to serve the minor's best interests, rather than the minor's wishes, is reinforced by the fact that appointed counsel for minors routinely serve in a dual role, as both the child's legal counsel and the child's guardian ad litem under the federal Child Abuse Prevention and Treatment Act (CAPTA).[11] (42 U.S.C. § 5101 et seq.; see § 326.5; rule 5.662(c) ["An attorney appointed under rule 5.660 will serve as the child's CAPTA guardian ad litem"]; Los Angeles Superior Court Local Rules, rule 17.16(b)(1) ["the Court shall appoint counsel for each child who is the subject of any dependency petition who shall also serve in the capacity of a [CAPTA] Guardian ad Litem for the child"].) "[T]he CAPTA guardian ad litem is a fiduciary whose role is to investigate the child's circumstances and advocate for her best interests." (In re Josiah Z., supra, 36 Cal.4th at p. 679, 31 Cal.Rptr.3d 472,115 P.3d 1133; see also 45 C.F.R. § 1340.14(g) (2007) [CAPTA guardian ad litem "to represent and protect the rights and best interests of the child"]; rule 5.662(d) [CAPTA guardian ad litem's duties are "[t]o obtain firsthand a clear understanding of the situation and needs of the child" and "[t]o make recommendations to the court concerning the best interest of the child"].)
Because the primary duty of a dependency lawyer representing minor siblings is to advocate for the minors' best interests, it is conceivable that a dependency lawyer would not face a conflict of interest in circumstances that would likely present such a conflict in the civil or criminal context. For example, when two minor clients express different preferences regarding visitation, their joint attorney has a duty to consider their wishes and report their preferences to the juvenile court (§ 317, subd. (e)), but the attorney has a duty zealously to advocate only the visitation policy that the attorney believes to be *715 in both minors' best interests. (See In re Candida S., supra, 7 Cal.App.4th at pp. 1243, 1251, 9 Cal.Rptr.2d 521.) Similarly, the fact that termination of parental rights and a permanent plan of adoption might have adverse financial consequences for one of two siblings does not present a conflict of interest for the siblings' joint attorney, if adoption is in the best interests of both children. (See In re Barbara R. (2006) 137 Cal.App.4th 941, 953-954, 40 Cal.Rptr.3d 687.)
Courts in other jurisdictions have held that, notwithstanding the conflicting views of the children, there is no conflict between them if their "best interests" do not conflict. Thus, the Iowa Supreme Court held that no conflict of interest arose when a single lawyer representedin a contested court proceedingboth a 13 year-old girl who opposed the termination of her mother's parental rights, and her nine year-old brother who favored termination and who implicated the mother in sexual abuse of the children. (In the Interest of J.P.B. (Iowa 1988) 419 N.W.2d 387, 391-392.) "[T]he very reason for contested custody proceedings," the court reasoned, "is that the children involved are not yet mature enough to be self-determining. It is the best interests of these minor children, not their wishes, which determine the outcome of the case. In other words, their real interests are not inconsistent or mutually exclusive." (Id. at p. 391; see also In re Georgette (2003) 439 Mass. 28, 785 N.E.2d 356, 361-362 [no actual conflict when jointly represented siblings expressed different custody preferences but one sibling's decision to remain in foster care was not challenged by father]; see generally, Sobie, The Child Client: Representing Children in Child Protection Proceedings (2006) 22 Touro L.Rev. 745, 787-806 [distinguishing between "best interests" and "child wishes" models of legal representation for minors]; Patton, Legislative Regulation of Dependency Court Attorneys: Public Relations and Separation of Powers (1998) 24 J. Legis. 3, 5 [section 317, subd. (e) is "the first statute in American jurisprudence which forbids attorneys to argue their competent client's stated preferences to the court"]; Wu, Conflicts of Interest in the Representation of Children in Dependency Cases (1996) 64 Fordham L.Rev. 1857, 1860-1862 [attorney's "duty of loyalty cannot be reconciled easily with the best interest' model of advocacy"] and pp. 1862-1865 [contrasting view that would apply "standard" conflicts framework to cases of concurrent sibling representation with view that the "court's ultimate goal of determining the child's best interests overrides those ethical mandates"].)
The second problem that arises in applying rule 5.660(c) and In re Celine R., supra, 31 Cal.4th 45, 1 Cal.Rptr.3d 432, 71 P.3d 787 is determining when a merely "potential" conflict ripens into an "actual" conflict. Neither of those authorities, nor the California Rules of Professional Conduct (see CRPC rule 3-310(0), attempt to draw the line demarking when "potential" becomes "actual." One authority has opined that an "actual" conflict is nothing more than a "potential" conflict that has resulted in a breach of duty. (Freedman & Smith, Understanding Lawyers' Ethics (2d ed.2002) p. 266.) This is not the meaning of those terms as used in the California ethics rules or rule 5.660(c). We believe that under rule 5.660(c), a conflict becomes "actual" when an attorney's duties of loyalty, confidentiality, and zealous advocacy require the attorney to take or to refrain from taking some action to serve the "best interests" of one minor client, but the attorney is unable to do so without violating a duty owed by the attorney to another client; or when the attorney is unable independently to evaluate the best interests of each minor client *716 because of the minors' conflicting interests. (See 1 Hazard & Hodes, The Law of Lawyering (3d ed.2004 supp.) Conflicts of Interest, § 10.4, p. 10-13 [terms "potential" and "actual" "must have reference to the degree of likelihood that the riskthe potentialitywill ripen into adverse effectthe actuality"]; 2 Mallen and Smith, Legal Malpractice (2007 ed.) § 16:2, p. 818 ["An actual conflict exists when an attorney's professional judgment for one client necessarily will be affected adversely because of the interests of another client"].)
Rule 5.660(c)(2)(B) gives guidance regarding the circumstances that constitute an actual conflict by specifying circumstances that, alone, do not give rise to an actual conflict. "The following circumstances, standing alone, do not necessarily demonstrate an actual conflict of interest: [¶] (i) The siblings are of different ages; [¶] (ii) The siblings have different parents; [¶] (iii) There is a purely theoretical or abstract conflict of interest among the siblings; [¶] (iv) Some of the siblings are more likely to be adopted than others; [¶] (v) The siblings have different permanent plans; [¶] (vii) The siblings express conflicting desires or objectives, but the issues involved are not material to the case; or [¶] (vii) The siblings give different or contradictory accounts of the events, but the issues involved are not material to the case."
Only one decision published since the effective date of rule 5.660(c) has addressed the circumstances that give rise to an actual conflict among multiple siblings in dependency proceedings. In In re Barbara R., supra, 137 Cal.App.4th 941, 40 Cal.Rptr.3d 687, one attorney was appointed to represent two siblings. One of the siblings was a registered member of an Indian tribe, subject to the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.), and entitled to receive "significant benefits" from the tribe, including a $1,500 per month stipend in trust, free higher education, and housing on the reservation. (Id. at pp. 944-945, 947, 952, 40 Cal. Rptr.3d 687.) The San Diego County Health and Human Services Agency (HSA) recommended a permanent plan of adoption for both siblings with the non-Indian child's paternal grandparents. (Id. at p. 945, 40 Cal.Rptr.3d 687.) The Indian child's tribe objected to the adoption, and there was some indication that the Indian child would lose her tribal benefits if parental rights were terminated. (Id. at pp. 947-949, 40 Cal.Rptr.3d 687.) The juvenile court suggested that the parties provide an offer of proof specifying "`exactly what [the Indian child] is entitled to.'" (Id at p. 949, 40 Cal.Rptr.3d 687.) Counsel for the children objected and refused to stipulate to such an offer of proof, contending that "the existence of financial benefits was not relevant to the issues raised in a permanency hearing under section 366.26." (Ibid.) The juvenile court adopted HSA's recommendation of adoption, and terminated the mother's parental rights. (Ibid.) The mother appealed, arguing, inter alia, that the children's attorney was subject to a conflict. (Id at p. 952, 40 Cal.Rptr.3d 687.)
The court of appeal held that "there [was] no basis to allege a conflict of interest on the part of the minor's counsel" because the children "did not have adverse interests." (In re Barbara R., supra, 137 Cal.App.4th at p. 953, 40 Cal.Rptr.3d 687.) "A conflict arises where minor's counsel seeks a course of action for one child with adverse consequences to the other. Here, no such conflict existed." (Ibid.) The court reasoned that the grandparents were committed to adopting both children, both children had bonded with the grandparents, and the children would be "lost without each other." (Ibid.) "[A]doption would ensure the children would be raised together *717 and the sibling relationship would remain intact." (Id. at pp. 953-954, 40 Cal. Rptr.3d 687.) "Thus," the court concluded, "... the children's interests were not adversarial and minor's counsel was not subject to conflict." (Id. at p. 954, 40 Cal.Rptr.3d 687.)
Several cases predating both rule 5.660(c) and In re Celine R., supra, 31 Cal.4th 45, 1 Cal.Rptr.3d 432, 71 P.3d 787 addressed actual conflicts in dependency proceedings.[12] In In re Richard H., supra, 234 Cal.App.3d 1351, 285 Cal.Rptr. 917, county counsel represented both the Los Angeles Department of Children's Services (DCS) (as it was then called) and two minor siblings. (Id, at p. 1367, 285 Cal.Rptr. 917.) The minors' father appealed the juvenile court's order declaring the minors dependents of the court (id, at p. 1355, 285 Cal.Rptr. 917), arguing, inter alia, that the juvenile court should have appointed separate counsel for the minors because DCS "took a position contrary to the section 319 presumption of family reunification," thereby creating "an actual conflict between DCS and the Minors...." (Id, at p. 1367, 285 Cal.Rptr. 917.) The court of appeal disagreed. "Appellant provides no authority," the court reasoned, "... that a dependency petition which does not recommend family reunification automatically creates a conflict of interest on the basis that DCS's position is against the presumed position of a minor." (Id, at p. 1368, 285 Cal.Rptr. 917.) "Given the purpose of juvenile proceedings to look out for the best interests of the minor, we do not read into section 319 a presumption ' that family reunification must always be recommended or an implication that the failure to recommend family reunification automatically creates a conflict between DCS and a minor's best interests. After all, the preference of the minor is not determinative of his or her best interests. [Citation.]" (Ibid.; see also In re Mary C. (1995) 41 Cal.App.4th 71, 80-81, 48 Cal. Rptr.2d 346 [no actual conflict between minor and DCFS requiring appointment of separate counsel on appeal when minor expressed no preference concerning placement, appellate counsel's position was "that expressed by the minor's separate attorney in the trial court," and appellate counsel for DCFS "unequivocally indicated there is no conflict of interest"].)
In re Candida S., supra, 7 Cal.App.4th 1240, 9 Cal.Rptr.2d 521, involved four siblings, all represented by one attorney. (Id, at pp. 1243, 1251, 9 Cal.Rptr.2d 521.) The mother appealed the juvenile court's orders at the six-month review hearing, arguing, inter alia, that the juvenile court should have appointed separate counsel for each of the minors. The mother claimed that a conflict existed among the minors because "some wanted to visit their siblings while others did not." (Id. at p. 1251, 9 Cal.Rptr.2d 521.) The appellate court held that the minors' different preferences relating to sibling visitation did not give rise to an actual conflict of interest requiring the appointment of separate counsel. The court stated, "The only evidence presented ... here is that some of the children wanted visitation and others did not. However, the obligation of counsel for a dependent minor is to pursue whatever is in the minor's best interest. This may or may not be what the minor wishes. Nothing would preclude counsel from informing the court that one child wants visitation and another does not. It would then be up *718 to the court to determine whether there should be any visitation and, if so, with whom, the frequency and length of visitation. [Citation.] In the absence of any further facts, nothing in this record rises to the level of an actual conflict of interest requiring appointment of independent counsel." (Id. at p. 1253, 9 Cal.Rptr.2d 521.)
In Carroll v. Superior Court (2002) 101 Cal.App.4th 1423, 124 Cal.Rptr.2d 891, the court considered whether the then newly enacted sibling-relationship exception to the statutory preference for adoption in section 366.26, subdivision (c)(1)(E) created an actual conflict among siblings when fewer than all of the siblings were adoptable. In that case, one attorney was appointed to represent seven siblings, all of whom were the subject of section 300 petitions filed by the San Diego County Health and Human Services Agency (HSA). HSA recommended adoption as the permanent plan for three of the siblings. HSA recommended guardianship for three other siblings, who hoped to reunify with their mother. The seventh child was significantly developmentally delayed, and the caretaker who was willing to act as guardian for three of her siblings asked that she be placed elsewhere. (Id. at pp. 1425-1426, 124 Cal.Rptr.2d 891.) Three of the children, including two who were to be adopted, expressed their desire to preserve their relationships with their siblings. (Id. at pp. 1426-1427, 124 Cal. Rptr.2d 891.) The attorney sought to withdraw from representing the seven siblings, arguing that the siblings' different interests would require her to counsel and advocate both against adoption as a permanent plan (to preserve the siblings' relationships) and for adoption as a permanent plan (to serve the best interests of some of her clients). (Ibid.) The juvenile court denied the attorney's motion to withdraw.
The court of appeal issued a writ of mandate, directing the juvenile court to grant the attorney's motion to withdraw. The court held that "an actual conflict of interest arose among at least some members of the client group." (Carroll v. Superior Court, supra, 101 Cal.App.4th at p. 1428, 124 Cal.Rptr.2d 891.) "[T]he same attorney could not pursue [one sibling's] interests by opposing a permanent plan of adoption for [his sister] ... and simultaneously independently evaluate whether [the sister's] best interests would be served by the stability provided by adoption." (Ibid.)[13]
The California authorities thus support our view of what qualifies as an actual conflict in dependency proceedings, and recognize that the conflicting preferences of minor clients do not necessarily give rise to a disqualifying conflict, for it is the attorney's role to make a reasonable, independent determination of the minors' best interests, notwithstanding the minors' preferences.

2. Evidence Supports an Actual Conflict of Interest

The juvenile court initially disqualified CLC Unit 1 on the basis of the so-called "systemic" or "structural" conflict it perceived to be created by the Center's administrative reorganization, which would be an erroneous basis for such disqualification. (See Discussion Part C post.) The juvenile court stated its intention to appoint *719 one lawyer to represent all four of CLC Unit l's former clients. Counsel for Nah. H. thereafter raised the issue of a conflict between Joshua and Justin, on the one hand, and Naes. and Nay., on the other hand. By the time the juvenile court issued its minute order, it changed its ruling to disqualify both CLC Units 1 and 2, and to appoint separate counsel for Joshua and Justin, on the one hand, and Naes. and Nay., on the other hand. On appeal, we must indulge "[a]ll intendments and presumptions ... to support [the lower court's order] on matters as to which the record is silent." (Denham v. Superior Court (Marsh & Kidder) (1970) 2 Cal.3d 557, 564, 86 Cal.Rptr. 65, 468 P.2d 193; see SpeeDee Oil, supra, 20 Cal.4th at pp. 1143-1144, 86 Cal.Rptr.2d 816, 980 P.2d 371.) Viewed together and in a light most favorable to the juvenile court's order, the circumstances at the time of the minute order disqualifying the Center imply that at least one of the grounds for disqualification was a finding by the juvenile court of an actual conflict between Joshua and Justin, on the one hand, and Naes. and Nay., on the other hand. (See rule 5.660(c)(2)(G); In re Celine R., supra, 31 Cal.4th at p. 58, 1 Cal.Rptr.3d 432, 71 P.3d 787 [disqualification of attorney for multiple siblings in a dependency proceeding must be based on an actual conflict].) Furthermore, even if the juvenile court erroneously relied on the so-called "structural" conflict in making its disqualification order, we will nevertheless affirm if substantial evidence supports the disqualification. "There is perhaps no rule of review more firmly established than the principle that a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason. If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion." (Belair v. Riverside County Flood Control Dist, (1988) 47 Cal.3d 550, 568, 253 Cal. Rptr. 693, 764 P.2d 1070; see In re Lucero L. (2000) 22 Cal.4th 1227, 1249-1250, 96 Cal.Rptr.2d 56, 998 P.2d 1019 (plur. opn. of Mosk, J.) [applying substantial evidence standard to affirm juvenile court ruling made on erroneous legal basis].) Substantial evidence supports the disqualification in this case.
At the time of their detention, Joshua was seven and Justin was four; both were verbal and provided statements to DCFS social workers investigating Zamer's injuries and potential abuse against the other children in the household. Justin was the only witness to Zamer's injury, other than the alleged perpetrator, Nah. H., and three-year old Zamer himself. Joshua and Justin both identified Nah. H. as the person Zamer referred to as "12." Zamer alleged that "12" pushed him in the bathroom, resulting in his broken leg, and had once shut him in a closet. In addition, the First Amended Petition alleged that both Joshua and Justin were victims of abuse perpetrated by Nah. H., and both Joshua and Justin made statements to DCFS tending to implicate Nah. H. in such abuse. The interests of Joshua and Justin were directly adverse to those of Nah. H.
The juvenile court found that Nah. H. was the presumed father of the girls, Naes. and Nay. At the time of their detention, Naes. was one and Nay. was four-months old; both were preverbal. Neither displayed any signs of physical abuse when examined by physicians, and the only evidence of abuse directed against either of them was four-year old Justin's statement, "He [Nah. H.] don't sock Nas. [sic ] because she's a baby, but he pops her real hard." The First Amended Petition did not allege that either Naes. or Nay. had been abused.
*720 Although DCFS had recommended against reunification services for Nah. H. and his daughters, there is no evidence that Feldman, the girls' CLC Unit 1 attorney, had determined at this early stage in the proceedings that reunification services were not in the girls' best interests. Further, at the time of the disqualification order, the allegations in the First Amended Petition had not been adjudicatedthe case was on calendar for a contested jurisdictional hearing when the juvenile court made its disqualification order. Accordingly, the juvenile court had not yet determined whether reunification services between Nah. H. and his daughters were required by section 361.5.[14] The statements made by Joshua and Justin would be material to that determination. To advocate in favor of reunification services for Naes. and Nay., Feldman would have to dispute the accuracy or reliability of the statements made by Joshua and Justin, also Feldman's clients. Feldman had informed the juvenile court that he had received confidential information from Joshua and Justin. Further, the juvenile court could reasonably conclude that Feldman could not professionally and independently evaluate each child's best interests when faced with this dilemma, thus transforming the potential conflict into an actual conflict. As we have stated, the inability to evaluate independently the best interests of each minor client because of the minors' conflicting interests is an actual conflict. (See Carroll v. Superior Court, supra, 101 Cal. App.4th at p. 1428, 124 Cal.Rptr.2d 891.)
Accordingly, because the matter was on calendar for a contested hearing in which the interests of Joshua and Justin, on the one hand, and Naes. and Nay., on the other hand, were, at that time, inconsistent, substantial evidence supports the juvenile court's finding that CLC Unit 1 had an actual conflict. The juvenile court did not abuse its discretion in concluding that the interests of Joshua and Justin were inconsistent with those of Naes. and Nay., and thereby posed "a substantial risk that the [CLC Unit 1] lawyer's representation of [Joshua and Justin] would be materially and adversely affected by ... the lawyer's duties to [Naes. and Nay.]...." (Rest.3d of the Law Governing Lawyers § 121; see Charlisse, supra, 149 Cal.App.4th at pp. 1566-1567, 58 Cal.Rptr.3d 173 (lead opn. of Mosk, J.).) The juvenile court could thus reasonably conclude that CLC Unit 1 should be disqualified under Rule 5.660(c)(2)(E) and In re Celine R., supra, 31 Cal.4th 45, 1 Cal.Rptr.3d 432, 71 P.3d 787. We affirm the order disqualifying CLC Unit 1.

C. The Juvenile Court Abused Its Discretion in Disqualifying CLC Unit 2
The juvenile court did not state either on the record or in its minute order the reason it disqualified Gupta, Zamer's CLC Unit 2 attorney. Because CLC Unit 2 represented only one client, Zamer, we examine the record to determine whether substantial evidence supports the juvenile court's implied findings that (1) Zamer had an actual conflict with one or more of his siblings represented by CLC Unit 1, and, if so, (2) the circumstances of this case justify treating CLC Units 1 and 2 as a single law firm for conflict purposes. *721 (SpeeDee Oil, supra, 20 Cal.4th at pp. 1143-1144, 86 Cal.Rptr.2d 816, 980 P.2d 371; Jasmine, supra, 152 Cal.App.4th 297, 61 Cal.Rptr.3d at 262-265; see also rule 5.660(c)(2)(E); In re Celine R., supra, 31 Cal.4th at p. 58, 1 Cal.Rptr.3d 432, 71 P.3d 787.)
For the reasons stated with respect to the conflict between Joshua and Justin, on the one hand, and Naes. and Nay., on the other hand, substantial evidence supports the conclusion that Zamer had an actual conflict with Naes. and Nay. Zamer's testimony regarding the alleged abuse by Nah. H., as that of Joshua and Justin, would conflict with the interests of Nah. H.'s daughters, Naes. and Nay.
The juvenile court erred, however, in treating CLC Units 1 and 2 as a single law firm for conflict purposes. As we held in Charlisse, supra, 149 Cal.App.4th at p. 1579, 58 Cal.Rptr.3d 173 (lead opn. of Mosk, J.) and p. 1580 (cone. opn. of Armstrong, J.) and Jasmine, supra, 152 Cal. App.4th 297, 61 Cal.Rptr.3d at 265, the Center's administrative reorganization does not warrant treating its separate units as a single firm for conflict purposes. The record contains no evidence of either a breach of the Center's ethical screens pertinent to this case, or of persistent, material violations indicating that the Center's ethical screens have broken down. We therefore reverse the order disqualifying CLC Unit 2.

DISPOSITION
The juvenile court's order disqualifying CLC Unit 1 is affirmed. The order disqualifying CLC Unit 2 is reversed.
ARMSTRONG, J., concur.
TURNER, P.J., concurring and dissenting.
I would reverse the disqualification orders in their entirety. It bears emphasis the disqualification orders were entered prior to the adjudication hearing. There was no evidence the children's attorneys, acting as counsel and guardians ad litem, will assert in any future hearing actually conflicting positions. Nor was there any evidence that in any prior hearing actually conflicting positions were asserted. No doubt, there was a potential conflict of interest between the children; but that state of affairs cannot justify a disqualification order based on conflict of interest grounds in dependency cases. (In re Celine R. (2003) 31 Cal.4th 45, 58, 1 Cal. Rptr.3d 432, 71 P.3d 787; Carroll v. Superior Court (2002) 101 Cal.App.4th 1423, 1428-1430, 124 Cal.Rptr.2d 891; Welf. & Inst.Code, § 317, subd. (c).)
Further, the juvenile court never found there was an actual conflict of interest nor ruled on that basis in issuing the disqualification orders. Given that the juvenile court never exercised its discretion on the ground an actual conflict of interest existed, I do not believe we can uphold any part of its ruling on a ground never utilized by it. (Olvera v. Olvera (1991) 232 Cal. App.3d 32, 39, 283 Cal.Rptr. 271; Cramer v. Morrison (1979) 88 Cal.App.3d 873, 887, 153 Cal.Rptr. 865; Zak v. State Farm Mut. Liab. Ins. Co. (1965) 232 Cal.App.2d 500, 506, 42 Cal.Rptr. 908; see Clothesrigger, Inc. v. GTE Corp. (1987) 191 Cal. App.3d 605, 621, 236 Cal.Rptr. 605.) Regardless of the evidence concerning noncompliance with the ethical walls mandated by Castro v. Los Angeles County Bd. of Supervisors (1991) 232 Cal.App.3d 1432, 1435-1445, 284 Cal.Rptr. 154, no improper concurrent representation issue was present when the disqualification orders were entered.
NOTES
[1] We sometimes refer to conflict of interest or conflicts of interest as a "conflict" or "conflicts."
[2] This court granted the Center's request for judicial notice of the record on appeal in both Charlisse, supra, 149 Cal.App.4th 1554, 58 Cal.Rptr.3d 173 and Jasmine, supra, 152 Cal. App.4th 297, 61 Cal.Rptr.3d 256. Counsel for Joshua and Justin has requested that we take judicial notice of a juvenile court minute order and transcript of hearing dated November 30, 2007 in Jasmine after Center filed its notice of appeal in that case. In Jasmine, supra, 152 Cal.App.4th 297, fn. 9, 61 Cal. Rptr.3d at 264, fn. 9, we denied a motion to augment the record on appeal in that case with these same materials. For the reasons stated therein, we also decline to consider them on this appeal. (Ibid.; see In re Zeth S. (2003) 31 Cal.4th 396, 405, 2 Cal.Rptr.3d 683, 73 P.3d 541.)
[3] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.
[4] Prior to 2005, the Center represented both parents and children in dependency proceedings. (See Castro, supra, 232 Cal.App.3d at p. 1436, 284 Cal.Rptr. 154.) The Center now provides legal services only to children. The Center's structure would also allow it to represent multiple parties when there were conflicting interests arising out of successive representation in separate proceedings. (See Charlisse, supra, 149 Cal.App.4th at pp. 1578 1579, 58 Cal.Rptr.3d 173 (lead opn. of Mosk, J.) and pp. 1580-1581, 58 Cal.Rptr.3d 173 (cone. opn. of Armstrong, J.).)
[5] Joshua E., Sr. was later located at the California Institution for Men in Chino. He was released from prison while these proceedings were pending. He appeared in court and was provided with appointed counsel on November 1. (See post at fn. 6.)
[6] The juvenile court appointed Baca to represent Joshua E., Sr. at the beginning of the November 1 hearing. Joshua E., Sr. was present in the courtroom. Neither Baca nor Joshua E., Sr. objected to the appointment. Baca was present, and presumably represented Joshua E., Sr.'s interests, at nearly the entire November 1 hearing. For appointed counsel, "[t]he attorney-client relationship commences upon counsel's appointment]" (1 Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2006) ¶¶ 3:85, p. 3-37; accord, Rest.3d of the Law Governing Lawyers, § 14(2) ["A relationship of client and lawyer arises when: [] (2) a tribunal with power to do so appoints the lawyer to provide the services"].) "Once an attorney is appointed to represent a client, he assumes the authority and duty to control the proceedings." (People v. McKenzie (1983) 34 Cal.3d 616, 631, 194 Cal.Rptr. 462, 668 P.2d 769, overruled on another ground in People v. Crayton (2002) 28 Cal.4th 346, 364-365, 121 Cal.Rptr.2d 580, 48 P.3d 1136.) At the end of the November 1 hearing, however, the juvenile court relieved Baca from representing Joshua E., Sr. and appointed Baca to represent Joshua and Justin. By doing so, the juvenile court may have appointed an attorney to represent clients with interests adverse to those of her then-existing client in the same litigation, in violation of California Rules of Professional Conduct, rule 3-310(C). It is irrelevant that Baca's representation of Joshua E., Sr. was briefhe might have imparted confidential information to Baca prior to the hearing, or in off-the-record conversations during the hearing. The Los Angeles Superior Court's local rules require counsel appointed for a parent in dependency proceedings to make certain inquiries at the party's first appearance. (Los Angeles Superior Court Local Rules, rule 17.16(e)(1)-(4).) We need not ascertain whether Baca actually obtained confidential information from Joshua E., Sr. becauseas appellate counsel for Naes. and Nay. correctly points outthe communication of confidential information is presumed in such circumstances, and disqualification is automatic. "A lawyer who represents clients with adverse interests in same litigation automatically will be disqualified, as will a lawyer who switches sides during pending litigation, because both situations present an unacceptable risk that the lawyer's duties of loyalty and confidentiality will be compromised." (Charlisse, supra, 149 Cal.App.4th at p. 1568, 58 Cal.Rptr.3d 173 (lead opn. of Mosk, J.), citing City and County of San Francisco v. Cobra Solutions, Inc. (2006) 38 Cal.4th 839, 848, 43 Cal.Rptr.3d 771, 135 P.3d 20.) Joshua E., Sr. is not a party to this appeal and has not sought review of the juvenile court's order appointing Baca, nor does appellate counsel for Joshua or Justin raise: the issue. Accordingly, we do not review Baca's appointment.
[7] The children argue that the Center lacks standing to pursue this appeal. This court rejected the identical contention in both Charlisse, supra, 149 Cal.App.4th at pages 1564-1565, 58 Cal.Rptr.3d 173 (lead opn. of Mosk, J.) and at page 1583, 58 Cal.Rptr.3d 173 (dis. opn. of Turner, P. J.), and Jasmine, supra, 152 Cal.App.4th 297, fn. 6, 61 Cal.Rptr.3d at 262, fn. 6.
[8] CRPC rule 3-310(C) provides, in relevant part: "A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict...."
[9] Whether the record before the juvenile court when it appointed CLC Unit 1 indicated a reasonable likelihood an actual conflict would arise between or among Zamer's four half-siblings is not an issue before us. (See In re Celine R., supra, 31 Cal.4th at p. 58, 1 Cal.Rptr.3d 432, 71 P.3d 787.) None of the parties objected to the appointment of CLC Unit 1 in the juvenile court, and no party to this appeal has raised the issue.
[10] All subsequent rule references are to the California Rules of Court unless stated otherwise. Former rule 1438, in effect at the time of the disqualification order in this case, was renumbered rule 5.660 effective January 1, 2007.
[11] "The rules governing dependency guardians ad litem are slightly different than those applicable in civil proceedings.... [CAPTA] authorizes federal funding of state child protective services programs subject to various conditions. Among those conditions, a state must ensure appointment of a specially trained guardian ad litem in every judicial proceeding involving an abused or neglected child. [Citation.]" (In re Josiah Z., supra, 36 Cal.4th at p. 679, 31 Cal.Rptr.3d 472, 115 P.3d 1133.)
[12] The Supreme Court, in In re Celine R., supra, 31 Cal.4th 45, 1 Cal.Rptr.3d 432, 71 P.3d 787, did not decide whether the facts of that case gave rise to an actual conflict, holding instead that "any error [in not relieving counsel] was harmless." (Id. at p. 58, 1 Cal. Rptr.3d 432, 71 P.3d 787.)
[13] The California Supreme Court subsequently narrowed the sibling-relationship exception, holding that section 366.26, subdivision (c)(1)(E) permits the juvenile court to consider only whether severing sibling relationships would cause detriment to the child being considered for adoption, and not whether it would cause detriment to the child's siblings. (In re Celine R., supra, 31 Cal.4th at p. 54, 1 Cal.Rptr.3d 432, 71 P.3d 787.)
[14] Section 361.5, subdivision (a) requires the juvenile court to order family reunification services to a presumed father unless the court finds, by clear and convincing evidence, that one of the exceptions set forth in subdivision (b) applies. The exceptions include findings that the child was brought within the court's jurisdiction under section 300, subdivision (e) (severe physical abuse) (§ 361.5, subd. (b)(3)) or as a result of severe physical harm to the child or a sibling (§ 361.5, subd. (b)(6)).